264 F.3d 154 (2nd Cir. 2001)
 JOSEPH LOCURTO, PLAINTIFF-APPELLEE,
v.
HOWARD SAFIR, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT, THE CITY OF NEW YORK AND RUDOLPH GIULIANI, MAYOR OF THE CITY OF NEW YORK, DEFENDANTS-APPELLANTS.
JONATHAN WALTERS, PLAINTIFF-APPELLEE,
v.
RUDOLPH GIULIANI, MAYOR OF THE CITY OF NEW YORK, THOMAS VON ESSEN, COMMISSIONER OF THE FIRE DEPARTMENT OF THE CITY OF NEW YORK, AND THE CITY OF NEW YORK, DEFENDANTS-APPELLANTS.
ROBERT STEINER, PLAINTIFF-APPELLEE,
v.
RUDOLPH GIULIANI, MAYOR OF THE CITY OF NEW YORK, THOMAS VON-ESSEN, COMMISSIONER OF THE NEW YORK CITY FIRE DEPARTMENT, THE CITY OF NEW YORK, DEFENDANTS-APPELLANTS.
 Docket Nos. 00-7628, 00-7632, 00-7634
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: December 11, 2000
Decided August 27, 2001
 
 Defendants appeal the opinion and order entered on April 28, 2000 in the United States District Court for the Southern District of New York (Sprizzo, J.), denying defendants' motion for summary judgment on their qualified immunity defense to plaintiffs' First Amendment and due process claims.
 
 
 1
 Appeal dismissed in part, judgment below reversed in part, and plaintiffs' due process claim dismissed.[Copyrighted Material Omitted]
 
 
 2
 George Gutwirth, New York, New York (Francis F. Caputo, John F. Wirenius, Leonard J. Koerner, Michael D. Hess, Corporation Counsel of the City of New York, New York, New York, of counsel), for Defendants-Appellants.
 
 
 3
 Christopher Dunn, New York, New York (Arthur Eisenberg, Norman Siegel, New York Civil Liberties Union Foundation, New York, New York, of counsel), for Plaintiff-Appellee Joseph Locurto.
 
 
 4
 Michael N. Block, New York, New York (Sullivan Papain Block McGrath & Cannavo P.C., New York, New York, of counsel), for Plaintiff-Appellee Jonathan Walters.
 
 
 5
 Robert Didio, Kew Gardens, New York (Brettschneider & Didio, Llp, Kew Gardens, New York, of counsel), filed a brief for Plaintiff-Appellee Robert Steiner.
 
 
 6
 Before: Oakes, Cardamone, and Parker, Circuit Judges.
 
 Cardamone, Circuit Judge
 
 7
 On a Sunday afternoon in September 1998, 80 or so people, including two of the plaintiffs, attended a barbecue hosted by the third plaintiff in Broad Channel, Queens, New York. This social occasion was the genesis of a racist float entered the following day in Broad Channel's annual Labor Day parade. All three plaintiffs actively participated on the float, they say, as an exercise of their First Amendment right of freedom of speech. When the defendant Mayor of New York became aware of plaintiffs' participation in the float, he indicated they would be fired from their positions as city employees. Plaintiffs' actions and their ultimate termination from city employment touched off the instant litigation and this appeal, on a record that the district court correctly characterized as "murky." Thus, what was to have been a bright occasion quickly came to darkness and confusion.
 
 
 8
 Plaintiffs Joseph Locurto, Jonathan Walters, and Robert Steiner each brought suit pursuant to 42 U.S.C. § 1983 (1994 & Supp. V 1999), alleging they were terminated illegally from their positions of public employment, as a police officer and as firefighters with the City of New York, respectively. They claim they were fired without due process, and in retaliation for participating in the racially offensive float. Their complaints seek monetary and injunctive relief, and name the following as defendants: Rudolph W. Giuliani, Mayor of the City of New York; Howard Safir, former Commissioner of the New York City Police Department; Thomas Von Essen, Commissioner of the New York City Fire Department; and the City of New York.
 
 BACKGROUND
 The Broad Channel Labor Day Parade
 
 9
 Plaintiff Steiner hosted a barbecue at his home in Broad Channel for several score of his friends, including plaintiffs Locurto and Walters on September 6, 1998, a Sunday afternoon. There the possibility of creating a float for the town's annual Labor Day parade to be held the next day was discussed. The same group had previously sponsored floats titled "The Gooks of Hazzard" that parodied Asian Americans and the television show "The Dukes of Hazzard"; "Hasidic Park" that parodied Jewish Americans and the movie "Jurassic Park"; "Dysfunctional Family Feud" that poked fun at two local non-profit groups and spoofed a television game show; and "Jamaica Bay Watch" that addressed local water pollution concerns.
 
 
 10
 Two possible themes for the 1998 float were considered. One was a "Gottizilla" theme parodying Italian Americans. The other was a "Black to the Future -- Broad Channel 2098" theme purportedly parodying African Americans while referring to the future effects of racial integration on the predominantly Caucasian community of Broad Channel. When they parted Sunday night, plaintiffs thought the float would be the proposed "Gottizilla" theme, but when Locurto and Walters arrived at Steiner's house early Monday afternoon, the group had shifted to the "Black to the Future" theme, allegedly because there was insufficient time to complete the "Gottizilla" float.
 
 
 11
 The Broad Channel Labor Day Parade began at 1:30 p.m. The "Black to the Future" float was the last one and so did not leave the starting point until 2:00. Because of the advent of a heavy rainstorm at 2:30, the parade was canceled, so that the "Black to the Future" float never reached the viewing stand at the parade's end where local politicians judged the floats. During the half hour that the float was in the parade, Locurto, Walter, Steiner and several friends rode it costumed in blackface. Some participants chanted slogans such as "Crackers, we're moving in," and "No justice, no peace." Included as props were Kentucky Fried Chicken buckets, and a number of participants ate watermelon and threw the rinds to the audience. At one point, Walters grabbed the back of the truck carrying the float and let himself dangle towards the ground, in parody of the dragging murder of James Byrd, Jr. in Jasper, Texas a few months earlier.
 
 
 12
 Locurto, Walters, and Steiner were at the time public employees of the City of New York. Locurto had served as a police officer since February 1994, on assignment in a racially mixed precinct in Queens, without involvement in any violent or racial incidents. In addition to making over 30 arrests during his four years as an officer, Locurto had received an award for apprehending a fleeing felon. Steiner had joined the City Fire Department as a firefighter in February 1996, had served for a time in the South Bronx, and similarly had never been involved in any racial incidents. Walters had served with the Fire Department for eight years, the last three of which were spent without incident in a racially mixed neighborhood in Brooklyn after Walters' voluntary transfer.
 
 
 13
 All three of these men participated in the parade solely as citizens of the Broad Channel community, without wearing uniforms or other insignia that might identify them with their respective departments. Yet, as lifelong residents of Broad Channel, the possibility existed that they were individually recognizable to the crowd that gathered to watch the parade.
 
 The Public Controversy
 
 14
 The day following the parade, Tuesday, September 8, a television news station aired a videotape of the parade featuring the "Black to the Future" float. Much public controversy ensued. When informed that city personnel had participated in the float, New York City Mayor Rudolph W. Giuliani was quoted as responding, "I've spoken to [Police and Fire] Commissioners Safir and Von Essen, and we all agree that any police officer, firefighter or other city employee involved in this disgusting display of racism should be removed from positions of responsibility immediately. They will be fired." David W. Chen, Officers and Firemen Wore Blackface on Float, Officials Say, N.Y. Times, Sept. 11, 1998, at B1. At the same time, Locurto became aware that the Police Department was interested in talking to him about his involvement in the parade. When he came forward on Friday, September 11 -- and before being asked any questions about what he had done -- he was suspended from his job without pay. Steiner and Walters also met with the Fire Department to admit their participation, and they too were suspended.
 
 
 15
 On Saturday morning, September 12, Locurto held a press conference in which he apologized for his conduct. Mayor Giuliani publicly commented in response, "I'm not going to take the responsibility of keeping him on the police force and then three years from now he hurts somebody and somebody wants to know why he wasn't removed. The only way this guy gets back on the police force is if the Supreme Court of the United States tells us to put him back." Kit R. Roane, Suspended Officer Apologizes, Calling Float 'a Big Mistake', N.Y. Times, Sept. 13, 1998, at A51. That same day, the Reverend Al Sharpton led a march of over 100 demonstrators through the Broad Channel community, explaining that during the parade people were laughing and clapping, and his supporters wanted to let them know "it's not funny to us." David M. Herszenhorn, Sharpton-Led March Gets Warm Reception, N.Y. Times, Sept. 13, 1998, at A51.
 
 
 16
 The Disciplinary Proceedings: Police Officer Locurto
 
 
 17
 A week after the parade, on September 14, the New York City Police Department charged Locurto with two violations of Patrol Guide 104-01, page 3, paragraphs 2(a) and 4. The first alleged he had engaged "in conduct prejudicial to the good order, efficiency and discipline of the Department, to wit: said Officer did participate in and appear on a Labor Day parade float which depicted African-Americans in a demeaning and offensive manner." The second alleged Locurto "did knowingly associate with person(s) or organization(s) advocating hatred, or oppression of, or prejudice toward a racial or religious group."
 
 
 18
 An administrative hearing on the charges was held on October 5, 1998 before the City Police Department's Deputy Commissioner for Trials. The Police Department presented as witnesses Detective James Trudden, Chief of the Broad Channel Volunteer Fire Department, who testified to Locurto's participation in the parade, and Director of Training James O'Keefe, who testified to the Police Department's efforts to foster racial sensitivity among recruits and officers. In his defense, Locurto asserted that he was being disciplined only in retaliation for the content of his speech on a matter of public concern, in violation of his First Amendment rights. The hearing officer in her written decision rejected Locurto's First Amendment defense, recommended that he be found guilty of the first charge, but that the second charge be dismissed, and recommended further that Locurto be punished by dismissal from the police force.
 
 
 19
 Defendant Commissioner Safir had discretion to accept, reject, or modify the hearing officer's proposed findings, conclusions, and disposition of the charges, consistent with the record of the hearing. See 12 Rules of the City of New York §§ 15-06, 15-08 (1998). Five days after the hearing Commissioner Safir adopted all of the hearing officer's recommendations, and Officer Locurto was discharged from the Police Department.
 
 Firefighters Steiner and Walters
 
 20
 Meanwhile, the Fire Department charged Steiner and Walters on September 15 with (1) conduct instrumental in arousing racial hatred, (2) conduct reflecting discredit upon the Fire Department, and (3) conduct in violation of the oath of office, all in violation of § 25.1.3 of the Regulations for the Uniformed Force. These charges were set down for an administrative hearing before an administrative law judge (ALJ) from the City's Office for Administrative Trials and Hearings.
 
 
 21
 At the hearing, the Fire Department introduced testimony from Trudden that the volunteer fire department had, subsequent to the parade, received numerous threatening phone calls, necessitating the installation of a trace on incoming calls. Trudden also testified regarding an incident in which rocks were thrown at an ambulance operated by the Broad Channel Volunteer Fire Department, which had organized the Labor Day parade. In response, Steiner and Walters raised the defense that they, like Locurto, were being disciplined only in retaliation for the content of their speech. They introduced third- party testimony that Fire Commissioner Thomas Von Essen had concluded that "his hands were tied" by Mayor Giuliani's decision to fire any public employees participating in the float.
 
 
 22
 In a written decision dated October 16 the ALJ rejected plaintiffs' First Amendment defense and recommended that while the first charge should be dismissed, Steiner and Walters should be found guilty of the second and third charges, and be punished by dismissal from the Fire Department. As with the Police Department, the Fire Commissioner has discretion to accept or reject an ALJ's disciplinary recommendations. See 2 Rules of the City of New York § 2-01 (1998). Ten days after receiving the decision Commissioner Von Essen adopted all of the ALJ's recommendations. He concurred with the ALJ's findings that Steiner and Walters had not testified credibly or truthfully about their actions, that their actions were likely to erode public trust in the Fire Department, and that the egregiousness of their conduct, particularly Walters' mocking of the murder of James Byrd, Jr., merited the most severe penalty. Steiner and Walters were discharged from the Fire Department.
 
 The Federal Litigation
 
 23
 In September 1998 the plaintiffs each filed a complaint in the United States District Court for the Southern District of New York asserting a First Amendment retaliation claim as well as a due process claim under 42 U.S.C. § 1983. These cases were referred to Judge John E. Sprizzo and consolidated for pretrial purposes before him. Subsequently, the complaints were amended to add pendent state law claims pursuant to Article 78 of New York's Civil Practice Law and Rules and Articles 75 and 76 of New York's Civil Service Law.
 
 
 24
 Prior to any discovery, the parties filed cross-motions for summary judgment. Plaintiffs argued that the decision to terminate them was unjustified under Pickering v. Board of Education, 391 U.S. 563, 568 (1968), given the lack of evidence that their speech disrupted the efficient functioning of the Police and Fire Departments; and further, that this dearth of evidence, together with Mayor Giuliani's public comments, which indicated that he had prejudged the case, demonstrated that any purported concern for disruption was merely a pretext meant to conceal defendants' actual retaliatory motives. Defendants contended in response that plaintiffs' federal claims were collaterally estopped by the prior administrative determinations and, even if not, plaintiffs had failed to state valid First Amendment and due process claims. Defendants further asserted they were entitled to qualified immunity because their actions were objectively reasonable in light of clearly established law.
 
 
 25
 Following oral argument on the cross-motions for summary judgment, Judge Sprizzo denied both parties' motions in a written opinion and order. Locurto v. Giuliani, 95 F. Supp. 2d 161 (S.D.N.Y. 2000). First, he cited the existence of factual disputes as to whether plaintiffs had received a full and fair opportunity to litigate at the disciplinary hearings. The district court judge thereby concluded defendants' collateral estoppel argument could not be resolved on a motion for summary judgment, and that plaintiffs' contrary arguments were premature. Id. at 167-68. Second, Judge Sprizzo rejected defendants' qualified immunity defense, reasoning that given the "murky factual record" before him, he could not agree that plaintiffs failed to state a claim or that defendants' actions were objectively reasonable. Id. at 168. Each of the denials of summary judgment was "without prejudice" to its later renewal. Id.
 
 
 26
 With respect to the due process claim, the trial court added, in a footnote, that since it was established law that a government employer, before taking an adverse employment action, was required to give an employee a hearing that comported with due process, it could not conclude -- giving plaintiffs the benefit of every reasonable inference respecting the irregularities surrounding the hearings that culminated in plaintiffs' dismissal -- that defendants were entitled to qualified immunity as a matter of law. Id. at 168 n.4. In denying the cross- motions for summary judgment, the court did so "without prejudice," and ordered the parties to proceed with discovery. Id. at 168.
 
 
 27
 Defendants Giuliani, Safir, and Von Essen then brought an interlocutory appeal of the district court's order insofar as it denied their defense of qualified immunity. On November 27, 2000 a motions panel of this Court granted defendants' motion to stay discovery pending appeal, but referred plaintiffs' motion to dismiss the appeal for lack of appellate jurisdiction to the present merits panel. In the discussion that follows, our first task therefore is to determine whether defendants' appeal is taken from a final order giving us appellate jurisdiction. Upon concluding that we have no jurisdiction over the appeal as it relates to plaintiffs' First Amendment claims, our second task is to decide whether the district court properly denied defendants' motion for summary judgment with respect to the alleged due process violations of plaintiffs' rights at their termination hearings.
 
 DISCUSSION
 I. Appellate Jurisdiction
 
 28
 A. Denial of Qualified Immunity as Final Decision
 
 
 29
 Before reaching the merits, we must settle the question of whether we have jurisdiction over the appeal, especially given the fact that Judge Sprizzo's denials of summary judgment were "without prejudice." Ordinarily, an appeal lies only from a final judgment of a district court, since federal law limits appellate jurisdiction to review of "final decisions" of that court. 28 U.S.C. § 1291 (1994). Under the collateral order doctrine, the Supreme Court has ruled that the term "final decisions" also encompasses that small class of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). From that holding, it is clear that an interlocutory order is immediately appealable if it "[1] conclusively determine[s] the disputed question, [2] resolve[s] an important issue completely separable from the merits of the action, and [3] [would] be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978).
 
 
 30
 A denial by a district court of a claim of qualified immunity -- to the extent that it turns on an issue of law -- is a collateral order subject to immediate appeal. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). Under the qualified immunity doctrine, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Hence, the doctrine strikes a balance "between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury." Kaminsky v. Rosenblum, 929 F.2d 922, 924-25 (2d Cir. 1991) (citing Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, Ch. J.)).
 
 
 31
 To the extent the denial of the defense rests on a legal determination of the state of the law at the time of the official's actions, a denial of immunity is conceptually separable from the merits of the plaintiff's claim that his rights have been violated. Mitchell, 472 U.S. at 527-28. Because qualified immunity is a shield not only from liability, but also from the burdens of discovery and trial, a denial of immunity is effectively unreviewable if appeal is delayed until after a final judgment has been entered. Id. at 526-27. Such a denial also satisfies the requirement of finality, since the district court's legal determination is conclusive with respect to the official's entitlement to avoid the burdens of discovery and trial. Id. at 527. Accordingly, a denial of qualified immunity, to the extent it turns on a question of law, satisfies the three-pronged test of the collateral order doctrine set forth in Coopers & Lybrand, and is immediately appealable. Id. at 530.
 
 
 32
 Applying this test, we have permitted an interlocutory appeal from an order denying qualified immunity where the facts as alleged by plaintiff are assumed to be true, and the only question for appellate review is the legal determination whether the defendant official's conduct violated a clearly established constitutional right. X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 66 (2d Cir. 1999). Equally clear is that a defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial," since such an order is not truly separable from the merits of the action. Johnson v. Jones, 515 U.S. 304, 314, 319-20 (1995); accord Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir. 1995). Thus, we have dismissed appeals for lack of appellate jurisdiction where the only point challenged by the defendant was the district court's conclusion that a genuine issue of material fact existed regarding whether the defendant actually committed the acts alleged by the plaintiff. Martinez v. Simonetti, 202 F.3d 625, 632-33 (2d Cir. 2000); Tolbert v. Queens Coll., 164 F.3d 132, 139 (2d Cir. 1999). But cf. McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999) (reviewing "total absence of evidence" as matter of law) (collecting cases).
 
 1. Behrens v. Pelletier
 
 33
 In Behrens v. Pelletier, 516 U.S. 299, 307 (1996), the Supreme Court held that the collateral order doctrine permits successive interlocutory appeals of a district court's rulings denying qualified immunity. In Behrens, the district court had denied without prejudice the defendant's initial motion for dismissal or, in the alternative, for summary judgment, on the ground that summary judgment on qualified immunity was premature given the lack of discovery. Id. at 303. When the defendant renewed the motion following discovery, the district court again denied the motion, this time holding that material issues of fact precluded summary judgment. Id. at 304. The Ninth Circuit entertained the defendant's interlocutory appeal from the first ruling, but when defendant sought immediate appeal of the second ruling, the Ninth Circuit dismissed the appeal in light of its precedent permitting only one interlocutory appeal. Id. at 303-05.
 
 
 34
 The Supreme Court reversed the decision to dismiss the second appeal. Id. at 314. It said that qualified immunity gives government officials the right not only to avoid trial, but also to avoid pre-trial burdens like discovery that can be disruptive of government effectiveness; "[w]hether or not a later summary judgment motion is granted, denial of a motion to dismiss is conclusive as to this right." Id. at 308. As a result, the Ninth Circuit's one-appeal rule improperly forced government officials to choose between the right to avoid discovery and the right to avoid trial, when the qualified immunity doctrine set forth in Harlow and Mitchell encompassed both rights, thereby supporting a separate appeal to protect each right. See id. at 308-09. Behrens further noted that such successive pre-trial appeals typically will not be redundant, since motions for dismissal and for summary judgment follow different legal standards, and that the potential for abusive delays of proceedings was minimal. Id. at 309-10. The Court concluded, "an order denying qualified immunity, to the extent it turns on an 'issue of law,' is immediately appealable." Id. at 311 (quoting Mitchell, 472 U.S. at 530).
 
 
 35
 We think Behrens casts considerable doubt on the continued viability of our decision in Whalen v. County of Fulton, 19 F.3d 828 (2d Cir. 1994). In that case we dismissed an intermediate appeal in light of the district court's denial of the qualified immunity motion with the use of the phrase "without prejudice," believing that such denial did not conclusively determine the issue of immunity and therefore did not impinge on the right to avoid the trial itself. Id. at 830-31. Behrens now teaches us that such appeals should be permitted because denials of immunity are conclusive with regard to a defendant's right to avoid pre- trial discovery, so long as the validity of the denial of the qualified immunity defense can be decided as a matter of law in light of the record on appeal. 516 U.S. at 308.
 
 2. Similar Circuit Decisions
 
 36
 This conclusion is reinforced by our recent decision in X-Men Sec., Inc. v. Pataki, 196 F.3d 56. In X-Men, the district court denied in part an initial motion to dismiss the plaintiff's civil rights complaint on qualified immunity grounds, holding that in light of the lack of discovery the motion was premature and could be better decided on a motion for summary judgment. X-Men Sec., Inc. v. Pataki, 983 F. Supp. 101, 117 (E.D.N.Y. 1997). We declined to dismiss the appeal from that ruling for lack of jurisdiction, giving reasons equally applicable to the instant appeal:
 
 
 37
 Where the district court bases its refusal to grant a qualified-immunity motion on the premise that the court is unable to, or prefers not to, determine the motion without discovery into the alleged facts, that refusal constitutes at least an implicit decision that the complaint alleges a constitutional claim on which relief can be granted. That purely legal decision does not turn on whether the plaintiff can in fact elicit any evidence to support his allegations; it thus possesses the requisite finality for immediate appealability under the collateral order doctrine.
 
 
 38
 X-Men Sec., Inc., 196 F.3d at 66.
 
 
 39
 From this it follows that even when a district court rejects a qualified immunity defense due to a perceived need for further discovery, an appellate court may exercise jurisdiction to review an interlocutory appeal that questions whether -- on the plaintiff's version of the facts -- defendant's actions violated the plaintiff's clearly established constitutional rights as a matter of law. See id. at 66-67.
 
 
 40
 Several other circuits have similarly held. McVey v. Stacy, 157 F.3d 271, 275-76 (4th Cir. 1998) (relying on Behrens); Brown v. Nix, 33 F.3d 951, 953 (8th Cir. 1994); see also Behrens, 516 U.S. at 313 (even where district court denies summary judgment because of material issues of fact, appellate court may still review purely legal question whether, on plaintiff's version of facts, qualified immunity standard has been met as matter of law); Velasquez v. Senko, 813 F.2d 1509, 1510-11 (9th Cir. 1987) (appeal dismissed not because district court denied qualified immunity "without prejudice" but because only point raised by defendants turned on fact issue); cf. United States v. Yonkers Bd. of Educ., 893 F.2d 498, 503-04 (2d Cir. 1990) (denial of Eleventh Amendment immunity not immediately appealable because of need for factual development, but court noted that complaint stated allegations that, if proven, would overcome immunity bar as matter of law); Musso v. Hourigan, 836 F.2d 736, 741 (2d Cir. 1988) (denial of qualified immunity immediately appealable as to legal questions where district court failed to rule on the defense even though defendant's motion had raised it).
 
 
 41
 At first blush our conclusion that there is finality for jurisdictional purposes might appear to contradict other circuit decisions that have dismissed for lack of jurisdiction where the trial court wanted further discovery before ruling on qualified immunity. See 19 James Wm. Moore et al., Moore's Federal Practice § 202.07[2][b][ii], at 202-36 & n.19.14 (3d ed. 2000) (collecting cases); 15A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3914.10, at n.29 (2d ed. 1992 & Supp. 2000) (collecting cases). Closer inspection reveals this not to be true, as these cases not only predated Behrens, but also are consistent with Behrens' treatment of unresolved fact questions. See Schrob v. Catterson, 967 F.2d 929, 939 (3d Cir. 1992) (denial of substitution motion that vitiated immunity implicitly rested on unresolved factual issues); Maxey ex rel. Maxey v. Fulton, 890 F.2d 279, 283 (10th Cir. 1989) (by choosing not to appeal denial of initial dispositive motion, defendant waived ability to object to discovery that was ordered following denial, without prejudice, of later summary judgment motion); Lawson v. Abrams, 863 F.2d 260, 263 (2d Cir. 1988) (no interlocutory jurisdiction where discovery needed to determine whether absolute or qualified immunity applied based on defendants' conduct); Boulos v. Wilson, 834 F.2d 504, 508-09 (5th Cir. 1987) (qualified immunity ruling turned on factual issue whether defendant had coerced plaintiff's consent to warrantless search).
 
 
 42
 As a consequence, we hold that where a district court denies an initial dispositive motion on qualified immunity grounds prior to discovery, the appealability of that ruling depends not on whether the motion was denied without prejudice to its renewal following discovery, but rather on whether the ruling turns on a question of law.
 
 B. First Amendment Retaliation Claim
 
 43
 Defendants appeal the denial of qualified immunity on plaintiffs' First Amendment retaliation claim on the ground that their actions were objectively reasonable in light of clearly established First Amendment law as of September 1998. As noted, the district court disagreed with the argument that defendants' actions were objectively reasonable given the murky factual record before it. Locurto, 95 F. Supp. 2d at 168. Plaintiffs maintain we lack jurisdiction to resolve defendants' argument on appeal, since the district court's ruling turned on an issue of fact, and not on a question of law. To decipher what the district court meant by its cryptic ruling, and thus to determine whether the ruling turns on a question of law, we find it helpful first to examine the general contours of First Amendment retaliation law.
 
 1. First Amendment Retaliation Law
 
 44
 For over 30 years the Supreme Court has consistently held that while the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech. See, e.g., Waters v. Churchill, 511 U.S. 661, 668 (1994); Rankin v. McPherson, 483 U.S. 378, 383 (1987); Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). To make out a claim of illegal retaliation, a plaintiff must establish that what he said or did constituted speech on a matter of public concern, and that his speech was a motivating factor in the adverse action taken by the employer. Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998). For purposes of the present appeal, defendants do not strenuously dispute, as they did before the trial court, that plaintiffs' participation in the Broad Channel Labor Day Parade constituted First Amendment speech on a matter of public concern.
 
 
 45
 If a plaintiff makes such a showing, the government may nonetheless escape liability on either of two separate rationales: plaintiff's speech would disrupt the government's activities and such disruption is sufficient to outweigh the First Amendment value of plaintiff's speech, Waters, 511 U.S. at 668, 673, 681; or the government demonstrates "it would have taken the same adverse action in the absence of the protected speech," Heil, 147 F.3d at 110. Defendants do not invoke the element of causation as a basis for granting summary judgment on the ground of qualified immunity. Rather, they premise their appeal solely on the argument that the district court erred in failing to recognize that defendants could have objectively reasonably concluded, given the state of the law at the time, that the potential disruption to the Police and Fire Departments outweighed the First Amendment value of plaintiffs' speech.
 
 
 46
 This balancing of interests, commonly known as the "Pickering balancing test," presents a question of law for the court to resolve. Lewis v. Cowen, 165 F.3d 154, 161-62, 164 (2d Cir. 1999); see also Coady v. Steil, 187 F.3d 727, 731 n.3 (7th Cir. 1999) (reviewing Pickering balance on interlocutory appeal of qualified immunity denial). Under the Pickering test, a government employer may fire an employee for speaking on a matter of public concern if "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995). As this last element suggests, "even if the Pickering balance is resolved in the employer's favor, the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption." Lewis, 165 F.3d at 163; accord Crawford-El v. Britton, 523 U.S. 574, 585 (1998) (noting "retaliation for the exercise of free speech" as an example of a "claim[] for which an official's motive is a necessary element") (citing Pickering, 391 U.S. at 574); Sheppard v. Beerman, 94 F.3d 823, 827 (2d Cir. 1996).
 
 
 47
 Consequently, although the Pickering test presents a question of law, resolution of a First Amendment retaliation claim on a motion for summary judgment may not be possible if the plaintiff introduces sufficient evidence to create a genuine issue of material fact on the question of defendant's improper intent, which is a question of fact. See Sheppard, 94 F.3d at 828 (plaintiff may avoid summary judgment on First Amendment retaliation claim based on qualified immunity defense if he can show "particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive"); accord Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 12 (1st Cir. 2000); Kimberlin v. Quinlan, 199 F.3d 496, 502 (D.C. Cir. 1999); Hoard v. Sizemore, 198 F.3d 205, 219 (6th Cir. 1999); see also Crawford-El, 523 U.S. at 589 (distinguishing between "the plaintiff's showing of improper intent (a pure issue of fact), [and] the separate qualified immunity question... which is an 'essentially legal question'").
 
 2. The District Court's Opinion
 
 48
 We read the district court's opinion to reflect its belief that this is a case in which a fact issue as to retaliatory motive precludes an award of summary judgment. Had the district court attempted to resolve the Pickering balance as a matter of law, presumably it would have taken all of the evidence in the light most favorable to plaintiffs and would have proceeded to conduct a careful balancing of the respective interests at stake. See Lewis, 165 F.3d at 161-63 (discussing fact-intensive Pickering balancing inquiry). Such analysis is not reflected in the trial court's opinion. Instead, it discussed the evidence that indicated defendants had prejudged plaintiffs' disciplinary charges, see Locurto, 95 F. Supp. 2d at 167-68, and found it impossible to conclude that defendants' actions were objectively reasonable, "given the murky factual record before the Court," id. at 168.
 
 
 49
 We infer from this reasoning that the trial court found it unnecessary to analyze this case under the Pickering balancing test, since even if that balance were resolved in defendants' favor, the live factual issue as to subjective retaliatory intent would still preclude a grant of summary judgment for defendants. Cf. Behrens, 516 U.S. at 313 ("'[A] court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.'") (quoting Johnson, 515 U.S. at 319).
 
 
 50
 For our part, therefore, to review the district court's First Amendment ruling would ultimately require us to review its determination that sufficient evidence existed to create a genuine issue of fact on the question of subjective motivation. As just discussed, we lack jurisdiction to undertake such review on an interlocutory appeal. See Tellier v. Fields, No. 98-2249, 2001 WL 457767, at *5 (2d Cir. April 26, 2001) ("'What we may not do, after Johnson and Behrens, is entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense.'") (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)); Catone v. Spielmann, 149 F.3d 156, 161 (2d Cir. 1998) (dismissing for lack of appellate jurisdiction based on factual issues, even where "the district court did not expressly state that it was relying on a disputed issue of material fact").
 
 3. Existence of Factual Issues as to Intent
 
 51
 Defendants respond by citing a number of cases for the proposition that "'a district court's mere assertion that disputed factual issues exist [is not] enough to preclude an immediate appeal.'" Rohman v. New York City Trans. Auth., 215 F.3d 208, 215 (2d Cir. 2000) (quoting Salim, 93 F.3d at 89) (alteration in original). But these statements hail from decisions in which the defendant's appeal was otherwise amenable to resolution as a matter of law, independent of any factual issues identified by the district court.
 
 
 52
 In Rohman, for example, we reviewed a malicious prosecution claim, notwithstanding the fact-intensive element of malice, since even on the plaintiff's version of the facts the claim was resolvable on another element as a matter of law, namely, whether the defendant had initiated a prosecution. Id. at 215, 217-18. And, in Salim we exercised jurisdiction solely to determine whether, on the plaintiff's version of the facts, the defendant's use of force to effect a Fourth Amendment seizure was objectively reasonable as a matter of law. 93 F.3d at 91- 92; accord Tierney v. Davidson, 133 F.3d 189, 194 (2d Cir. 1998) ("Even where the lower court rules that material disputes of fact preclude summary judgment on qualified immunity, we may still exercise interlocutory jurisdiction if the defendant... contends that he is entitled to qualified immunity even under plaintiff's version of the facts.").
 
 
 53
 By contrast, the present appeal is not resolvable in an analogous fashion. In the first place, defendants have not conceded plaintiffs' version of the facts for purposes of their summary judgment motion. Further, defendants invoke no elements of plaintiffs' First Amendment claim that could resolve that claim as a matter of law, independent of the element of intent. The Supreme Court has suggested that a First Amendment retaliation claim may prove susceptible to summary judgment in appropriate cases based on the absence of elements from a plaintiff's threshold showing, such as whether the speech was on a matter of public concern as well as the element of causation. Crawford-El, 523 U.S. at 592-93; see also X-Men, 196 F.3d at 67-71 (notwithstanding allegation of motive, plaintiffs' First Amendment retaliation claim should have been dismissed as a matter of law because defendant legislators' free speech rights precluded recovery).
 
 
 54
 But, as noted, defendants do not contest either of those elements on this appeal. The only issue they challenge is whether their actions, in assessing the disruption that would result from plaintiffs' speech, were objectively reasonable under Pickering. Nevertheless, that balancing test is incapable of disposing of plaintiffs' First Amendment claim in light of the factual issue as to intent. See Acevedo-Garcia, 204 F.3d at 10-12 (dismissing qualified immunity appeal where defendant argued his actions were objectively reasonable but appeal turned on factual issue of motivation with respect to plaintiff's First Amendment retaliation claim); Hoard, 198 F.3d at 219-220 (same with respect to plaintiff's First Amendment claim of discharge based on political affiliation); see also Conn. Crim. Def. Lawyers Ass'n v. Forst (In re State Police Litig.), 88 F.3d 111, 125-26 (2d Cir. 1996) (dismissing qualified immunity appeal where defendants' legal arguments ultimately turned on resolution of factual contention).
 
 4. Subjective Intent and Qualified Immunity
 
 55
 Defendants further urge upon us that subjective intent is per se irrelevant to the inquiry into objective reasonableness. But this argument betrays a fundamental misconception of the application of the qualified immunity doctrine to constitutional claims for which intent is an element. In the usual case where intent is not an element, bare allegations of malice coupled with otherwise legitimate government action do not yield a viable constitutional claim. In such a case, the qualified immunity doctrine focuses only on whether the government official's actions were objectively reasonable in light of clearly established law, without regard for possible subjective malice. See Crawford-El, 523 U.S. at 587-88, 592. But where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law. See id. at 589 ("Thus, although evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case."); Sheppard, 94 F.3d at 828 ("[T]he employer's actual (subjective) motive is not irrelevant in a qualified immunity inquiry" on a First Amendment retaliation claim.).
 
 
 56
 Our own precedents have emphasized this distinction between generalized malice and particularized unlawful intent. For example, in Sound Aircraft Services, Inc. v. Town of East Hampton, 192 F.3d 329, 331-32 (2d Cir. 1999), where the plaintiff alleged that the town board had snubbed his bid for a municipal lease and instead awarded the lease to a competitor, we vacated a denial of qualified immunity based on the district court's perception of a factual issue as to the defendants' motivation. We reasoned that generalized malice of the sort identified by the district court is irrelevant to the qualified immunity inquiry into objective reasonableness, and we criticized the district court for not first pausing to frame the plaintiff's claim to determine whether intent was even an element of the claim. Id. at 334-35. In instructing the district court on remand, we noted that specific illegal intent might well be an element of a properly framed Equal Protection claim, but that the complaint as it then stood was too vague to state such a claim. Id. at 335.
 
 
 57
 To accept defendants' proposed approach in this case would effectively "immunize all defendants in cases involving motive-based constitutional torts, so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." Hoard, 198 F.3d at 218. Moreover, this is precisely the approach rejected by the Supreme Court in Crawford-El when it declined to adopt a heightened evidentiary standard for intent-based constitutional torts. See 523 U.S. at 593-94 (rejecting "Justice Scalia's unprecedented proposal to immunize all officials whose conduct is 'objectively valid,' regardless of improper intent") (quoting id. at 612 (Scalia, J., dissenting)); see also Hoard, 198 F.3d at 218-20 (discussing Crawford-El and rejecting defendant's "attempt to transform a factual question about his motivation into a legal question about the [objective] reasonableness of the discharges" challenged by plaintiffs' First Amendment claim). Rather, Crawford-El emphasized that the Federal Rules of Civil Procedure require only that "the plaintiff 'put forward specific, nonconclusory factual allegations' that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment." 523 U.S. at 598 (quoting Siegert v. Gilley, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring in judgment)).
 
 
 58
 The Crawford-El standard is entirely consistent with prior precedents from this Circuit that have held a plaintiff need only "show 'particularized evidence of direct or circumstantial facts' supporting his claim of unconstitutional motive" in order to survive a motion for summary judgment on the defense of qualified immunity. Sheppard, 94 F.3d at 828; accord Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995); see also Crawford-El, 523 U.S. at 608 (Rehnquist, C.J., dissenting) ("Under the Court's view, only a factfinder's ultimate determination of the motive with which [defendant] acted will resolve this case."). Indeed, our subsequent case law has continued to adhere to this standard as implicitly consistent with Crawford-El. See, e.g., Ford v. Moore, 237 F.3d 156, 162 n.3 (2d Cir. 2001); accord Acevedo-Garcia, 204 F.3d at 12; Hoard, 198 F.3d at 219. But see Stanley v. City of Dalton, 219 F.3d 1280, 1295-96 & nn.25-26 (11th Cir. 2000) ("[W]here the facts... show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.").
 
 
 59
 In sum, defendants' proposed per se rule flies in the face of Supreme Court precedent as well as our own, and therefore we cannot adopt it. Unlawful intent, a necessary element of plaintiffs' properly framed First Amendment retaliation claim, is an issue on which the district court found a genuine issue of material fact sufficient to defeat defendants' motion for summary judgment based on qualified immunity. Because plaintiffs' claim turns on an issue of fact rather than on a question of law, that portion of the present interlocutory appeal pertaining to the First Amendment claim must therefore be dismissed for lack of appellate jurisdiction.
 
 C. Jurisdiction Over Due Process Claim
 
 60
 Plaintiffs do not challenge our jurisdiction to review the district court's ruling on their due process claim. Nonetheless, we are independently obligated to examine our subject matter jurisdiction, regardless of whether the parties invite us to do so. Concourse Rehab. & Nursing Ctr. Inc. v. DeBuono, 179 F.3d 38, 43 (2d Cir. 1999).
 
 
 61
 On this portion of the appeal, the only issue raised by defendants is whether plaintiffs' allegation of due process violations at their administrative hearings is foreclosed by the existence of an adequate post-deprivation remedy in the form of an Article 78 proceeding under New York law. See Wilson v. Layne, 526 U.S. 603, 609 (1999) ("A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'") (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)); accord Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001) ("This must be the initial inquiry."). Whether a post-deprivation remedy is adequate presents a question of law. Gudema v. Nassau County, 163 F.3d 717, 724 (2d Cir. 1998). Thus, under the principles articulated earlier, we may properly exercise interlocutory jurisdiction over this portion of the appeal. See also Genas v. State of New York Dep't of Corr. Servs., 75 F.3d 825, 830, 833 (2d Cir. 1996) (exercising interlocutory jurisdiction over some but not all claims on appeal).
 
 
 62
 II. Did Termination Hearings Deny Plaintiffs Due Process?
 
 A. Standard of Review
 
 63
 We ordinarily review a district court's summary judgment ruling de novo to determine whether the evidentiary submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). On an interlocutory appeal from a qualified immunity ruling, our jurisdiction is limited to examining whether the immunity defense has been established as a matter of law based "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." Salim, 93 F.3d at 90; see also McCullough, 187 F.3d at 279-80 (reviewing "total absence of evidence" as matter of law).
 
 B. Due Process Claim
 
 64
 Plaintiffs' due process claim rests on the allegation that Police Commissioner Safir and Fire Commissioner Von Essen, both of whom possessed final authority to review plaintiffs' disciplinary adjudications, predetermined to fire plaintiffs from the outset, prior to any administrative hearings, at the direction of Mayor Giuliani. In support of this assertion, plaintiffs cite public remarks by defendants, particularly Mayor Giuliani, suggesting they had decided to terminate plaintiffs in advance of any adjudication. In addition, plaintiffs refer to a number of irregularities at the disciplinary hearings themselves that assertedly reflect how defendants' alleged bias infected the hearings.[1] Plaintiffs contend these defects could have been prevented, and a neutral adjudication assured, had defendants adopted appropriate recusal procedures.
 
 
 65
 As noted, the district court rejected defendants' qualified immunity defense to plaintiffs' claims, relying on what it perceived as irregularities surrounding the hearings, and further reasoning that it was clearly established that the government must provide an employee with a pre-termination hearing comporting with notions of due process. Locurto, 95 F. Supp. 2d at 168 n.4. Defendants challenge this ruling pointing out that New York law afforded plaintiffs the vehicle of an Article 78 proceeding, an adequate post-deprivation remedy.
 
 
 66
 Ordinarily, the due process clause of the Fourteenth Amendment requires that a state or local government afford persons "some kind of a hearing" prior to depriving them of a significant liberty or property interest. Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 299 (1981); Parratt v. Taylor, 451 U.S. 527, 540 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986). Defendants concede that Locurto, Steiner, and Walters possessed a constitutionally protected property interest in their tenure as public employees, terminable only for cause. See Gilbert v. Homar, 520 U.S. 924, 928-29 (1997). When such a public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46 (1985); see also Gilbert, 520 U.S. at 929.
 
 1. Random and Unauthorized Conduct
 
 67
 The Supreme Court distinguishes between deprivations of liberty or property occurring as a result of established governmental procedures, and those based on random, unauthorized acts by government officers. See Parratt, 451 U.S. at 541. Under the latter scenario, a deprivation effectuated through the random and unauthorized acts of government officials does not violate procedural due process so long as the government provides a meaningful remedy subsequent to the deprivation. Hudson v. Palmer, 468 U.S. 517, 531-32 (1984). The rationale for this principle is plain: because the challenged misconduct is random and unauthorized, it is impossible for the government to anticipate and prevent the wrongful loss of liberty or property in advance, and it has no realistic alternative other than to adopt remedies capable of righting the wrong after the deprivation. Id. at 532; Parratt, 494 U.S. at 541.
 
 
 68
 In this context, the parties dispute whether defendants' alleged misconduct was "random and unauthorized" for purposes of the due process analysis. On the one hand, defendants contend that any misconduct was random and unauthorized, given that New York law already prohibits bias in the context of administrative adjudications. See N.Y. A.P.A. Law § 303 (McKinney 1995) (presiding officers); 1616 Second Ave. Rest., Inc. v. New York State Liquor Auth., 75 N.Y.2d 158, 161 (1990) (due process); 12 Rules of the City of New York § 1-07(g) (1998) (OATH adjudicators). In defendants' view, due process is therefore satisfied because plaintiffs could have brought suit in New York Supreme Court to remedy such bias after the deprivation, under Article 78 of the New York Civil Practice Law and Rules. See 1616 Second Ave. Rest., 75 N.Y.2d at 161-66. Moreover, defendants cite several circuit decisions in support of their position. See Cronin v. Town of Amesbury, 81 F.3d 257, 260 & n.2 (1st Cir. 1996) (per curiam); McDaniels v. Flick, 59 F.3d 446, 458-61 (3d Cir. 1995); McKinney v. Pate, 20 F.3d 1550, 1562-63 (11th Cir. 1994) (en banc); Schaper v. City of Huntsville, 813 F.2d 709, 715-16 (5th Cir. 1987).
 
 
 69
 On the other hand, plaintiffs maintain that defendants' alleged misconduct was not random and unauthorized when seen through the lens of the Supreme Court's decision in Zinermon v. Burch, 494 U.S. 113 (1990). Zinermon held that the plaintiff had stated a procedural due process violation by alleging his admission to a state mental institution on a purportedly "voluntary" basis was without procedural protections adequate to ensure his competency to consent. Id. at 121, 136-39. By analogy, plaintiffs argue defendants' misconduct was not truly random and unauthorized because defendants possessed, but failed to exercise, plenary authority to adopt a recusal procedure capable of preventing such biased misconduct. See New York, N.Y., City Charter § 434(a) (1998) (Police Commissioner's disciplinary authority); id. § 487(a) (Fire Commissioner's disciplinary authority); New York, N.Y., Admin. Code § 14-115 (1998) (Police Commissioner); id. § 15-113 (Fire Commissioner); see also New York, N.Y., City Charter § 6 (Mayor's authority to appoint and remove commissioners).
 
 
 70
 We ultimately need not resolve whether defendants' alleged misconduct was "random and unauthorized," since even were we to resolve this dispute in plaintiffs' favor, we would still face the further question of what process is due. See Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 783-84 (2d Cir. 1991) (holding defendants' misconduct was not random and unauthorized under Zinermon and then proceeding to ask "what, if any, process was due"). Because, as discussed below, we conclude that due process is satisfied so long as the government provides a neutral adjudicator at the post-termination hearing for a tenured public employee, the question of "random and unauthorized" conduct becomes moot, and we therefore need not address it. See 1A Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation: Claims and Defenses § 3.22, at 376 (3d ed. 1997) ("Even when the Parratt-Hudson doctrine is found inapplicable, a court may find that a post-deprivation remedy satisfies procedural due process.").
 
 
 71
 Two additional considerations support our refusal to address this issue. First, the Zinermon decision has generated considerable confusion among the courts of appeals, see id. § 3.22, at 375, and although our Circuit has spoken on the question of what constitutes random and unauthorized conduct under Zinermon, e.g., Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880-82 (2d Cir. 1996), we decline to foray further into this legal thicket absent some real need to address the question. Second, the state and municipal provisions that prohibit biased adjudications already appear to provide a mechanism by which an interested party may seek the recusal of a purportedly biased adjudicator. See N.Y. A.P.A. Law § 303 ("Upon the filing in good faith by a party of a timely and sufficient affidavit of personal bias or disqualification of a presiding officer, the agency shall determine the matter as part of the record in the case, and its determination shall be a matter subject to judicial review at the conclusion of the adjudicatory proceeding."); 12 Rules of the City of New York § 1-07(g) (similar). Although plaintiffs suggest that an appropriate recusal mechanism would have allowed for transfer of their charges to adjudicators not subject to review by the Police and Fire Commissioners (indeed, Locurto asserts his request for such a transfer was rejected), they fail to indicate in any detail how the existing procedures were inadequate, and what additional recusal procedures would have cured these defects.
 
 
 72
 Given the uncertainty of this area of the law, the vagueness of plaintiffs' claim, and the irrelevance of this point to the resolution of the appeal, we decline to resolve whether defendants' alleged misconduct was "random and unauthorized." Instead, we assume this point in plaintiffs' favor for purposes of this appeal and will proceed accordingly to consider what, if any, process was due plaintiffs.
 
 2. The Process Due
 
 73
 The remaining question is what process was due. See Ezekwo, 940 F.2d at 784. As noted, plaintiffs believe due process required the adoption of a recusal mechanism to safeguard the neutrality of the decisionmaker at their pre-deprivation hearing. We cannot embrace that requirement. Although due process guarantees notice and a hearing prior to the termination of a tenured public employee, the requisite hearing is a minimal one. See Gilbert, 520 U.S. at 929 ("[A] public employee dismissable only for cause [i]s entitled to a very limited hearing prior to his termination.") (emphasis added). Thus, as the Supreme Court explained in Loudermill, a pre-termination hearing does not purport to resolve the propriety of the discharge, but serves mainly as a check against a mistake being made by ensuring there are reasonable grounds to find the charges against an employee are true and would support his termination. 470 U.S. at 545-46. Requiring more than notice of the charges, an explanation of the nature of the employer's evidence, and an opportunity for the employee to respond would impede the government's interest in quickly removing from service an unsatisfactory employee. Id. at 546. In reaching this result, Loudermill relied heavily on the fact that the state had afforded the plaintiff a full adversarial hearing subsequent to termination. Id. ("Our holding rests in part on the provisions in Ohio law for a full post-termination hearing.").
 
 
 74
 Since Loudermill we have not had occasion to decide squarely whether due process requires a neutral adjudicator at a pre-termination hearing of a tenured public employee. Concededly, the subject was discussed in Dwyer v. Regan, 777 F.2d 825, 833 (2d Cir. 1985), modified on other grounds, 793 F.2d 457 (2d Cir. 1986). The only question necessary to decide that case was whether due process entitled Dwyer to a pre- deprivation hearing upon request. See id. Because Dwyer had not alleged making such a request, the question whether due process further entitled him to a neutral adjudicator at that hearing was hypothetical and, as such, dicta. Cf. Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d 469, 478 (2d Cir. 1999) ("A hypothetical or abstract dispute does not present a case or controversy."). No subsequent decisions from our Circuit or other circuits have held that such a neutral adjudicator is a necessary component of due process at a pre-termination hearing. We hold that it is not.
 
 
 75
 We reach this conclusion for two reasons: First, such a requirement would run contrary to the letter and the spirit of Loudermill, which insisted only that the public employer give its employee notice of any charges and a chance to hear and respond to any evidence against him. See 470 U.S. at 545-46. We fully agree with the view that the costs to the state of additional pre-deprivation guarantees (in this case, a neutral adjudicator) outweigh possible benefits to the employee, given the availability of a full post-deprivation hearing. See id. Second, every circuit that has addressed this question has reached a conclusion similar to the one we reach. See Schacht v. Wis. Dep't of Corr., 175 F.3d 497, 503 (7th Cir. 1999); Walker v. City of Berkeley, 951 F.2d 182, 184 (9th Cir. 1991); Duchesne v. Williams, 849 F.2d 1004, 1008 (6th Cir. 1988) (en banc); Garraghty v. Jordan, 830 F.2d 1295, 1302 (4th Cir. 1987); see also Cronin, 81 F.3d at 260 (1st Cir.) (adjudicator's bias was "random and unauthorized," and hence full post-deprivation hearing satisfied due process); McDaniels, 59 F.3d at 459-60 (3d Cir.) (same); McKinney, 20 F.3d at 1562-63 (11th Cir.) (same); Schaper, 813 F.2d at 715-16 (5th Cir.) (same).
 
 
 76
 This holding is necessarily limited to the situation where the state affords plaintiff, subsequent to his termination, a full adversarial hearing before a neutral adjudicator. In the case at hand, plaintiffs do not dispute that New York afforded them such a hearing via an Article 78 proceeding in New York State Supreme Court. An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims. Gudema, 163 F.3d at 724. Petitioners proceeding under Article 78 may raise claims that the agency adjudicator was biased and prejudged the outcome, 1616 Second Ave. Rest., 75 N.Y.2d at 161-66; Hughes v. Suffolk County Dep't of Civil Serv., 74 N.Y.2d 833, 834, amended, 74 N.Y.2d 942550 N.Y.S.2d 274 (1989), that the determination was slanted by the adjudicator's refusal to recuse herself, Wood v. Cosgrove, 237 A.D.2d 616, 617 (2d Dep't 1997), or that ex parte communications with other officials may have infected the adjudicator's ruling, Miller v. McMahon, 240 A.D.2d 806, 808 (3d Dep't 1997).
 
 
 77
 An Article 78 proceeding therefore constitutes a wholly adequate post- deprivation hearing for due process purposes. E.g., Hellenic Am. Neighborhood Action Comm., 101 F.3d at 881. A distinction that some of the above cases typically involved random and unauthorized conduct, rather than conduct according to predetermined rules, is immaterial. See, e.g., Interboro Inst., Inc. v. Foley, 985 F.2d 90, 93-94 (2d Cir. 1993) (holding that Article 78 petition presented sufficient post-deprivation process to challenge auditor's decision to disallow payments to junior college based on predetermined criteria); Oberlander v. Perales, 740 F.2d 116, 120 (2d Cir. 1984) (holding that Article 78 petition presented sufficient process to challenge medicaid reimbursement rates set by panel according to predetermined protocol). Moreover, plaintiffs point to no persuasive authority that states an administrative hearing with a neutral adjudicator rather than judicial review under Article 78 is needed to satisfy due process. No reason exists to depart from the general presumption that a judicial trial represents the epitome of full process. See Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 100-01, 103 (2d Cir. 1988) ("Parratt teaches that a state may provide procedural due process in either an administrative or a judicial setting.").
 
 
 78
 Consequently, the allegations of plaintiffs' complaints fail to state a violation of due process at the administrative hearings and that claim must be dismissed in its entirety.
 
 CONCLUSION
 
 79
 Accordingly, for the reasons set forth above, defendants' appeal, to the extent that it challenged the district court's ruling on the First Amendment retaliation claim, is hereby dismissed for lack of jurisdiction. With respect to the due process claim raised by plaintiffs, we have satisfied ourselves that we have appellate jurisdiction, and hold that plaintiffs' claim should be dismissed for failure to allege a constitutional violation.
 
 
 
 NOTES:
 
 
 [1]
 Plaintiffs cite these irregularities only as evidence of the bias that infected those hearings, not as independent due process violations in their own right. Accordingly, we need not decide whether such irregular departures from established procedures, taken in isolation, would give rise to due process violations.