*160 OPINION OF THE COURT
Chief Judge Wachtler.
The issue on this appeal is whether public statements made by the Chairman of the State Liquor Authority (SLA) concerning charges then pending in an SLA proceeding against a licensee, disqualified the Chairman from participating in the administrative review of that proceeding. We conclude that, because the Chairman’s statements to a legislative oversight committee indicated prejudgment of facts in issue in an adjudicatory proceeding, his failure to disqualify himself from that proceeding deprived the licensee of due process of law under the Federal Constitution.
I.
Petitioner 1616 Second Avenue Restaurant, Inc., operates a Manhattan restaurant known as Dorrian’s Red Hand. Since 1962, Dorrian’s has sold alcoholic beverages for on-premises consumption pursuant to a license issued by respondent SLA. In August 1986, attention was focused on Dorrian’s because of its connection with the highly publicized "preppie murder” case: the young victim and the accused killer, Robert Chambers, had been in Dorrian’s on August 26, shortly before the crime. As a result, the SLA and the New York City Police Department’s Social Club Task Force began to closely monitor Dorrian’s for violations of the Alcoholic Beverage Control Law, especially those involving underage drinkers.
On February 10, 1987, Dorrian’s was charged by the SLA with violating section 65 (1) of the Alcoholic Beverage Control Law by allegedly selling or giving away alcoholic beverages to four underage patrons on November 14-16, 1986. Two of the charges were sustained following a hearing before an Administrative Law Judge commenced on April 15, 1987. The findings were controverted by petitioner and the matter was referred to the five Commissioners of the SLA, including its *161 Chairman, respondent Thomas Duffy, for factual review and for determination of an appropriate penalty (see, 9 NYCRR 54.4 [g]; 54.6 [a]).
In the interim between the filing of the charges and the commencement of the hearing, Chairman Duffy had been called upon to testify before a committee of the New York State Senate that oversees SLA operations. The questioning covered a wide range of topics, but for a time focused on the issue of underage drinking and the charges against Dorrian’s. Duffy’s public discussion of the charges prompted petitioner to request that Duffy recuse himself from consideration of the charges against Dorrian’s on the ground that he had prejudged the matter. Chairman Duffy declined to do so and, with his participation, the Commissioners adopted the findings of the Administrative Law Judge and imposed a 10-day suspension, a 10-day deferred suspension and a $1,000 bond claim.
Petitioner then commenced this article 78 proceeding seeking to annul the SLA’s determination. Upon transfer from Supreme Court pursuant to CPLR 7804 (g), the Appellate Division confirmed the determination without comment. We granted leave to consider whether the Chairman’s public statements disqualified him from participating in the SLA proceeding. Concluding that they did, we now reverse.
II.
Before examining the substance of the Chairman’s statements, we turn to the governing principles.
It is beyond dispute that an impartial decision maker is a core guarantee of due process, fully applicable to adjudicatory proceedings before administrative agencies (Withrow v Larkin, 421 US 35, 46-47; Matter of Warder v Board of Regents, 53 NY2d 186, 197; State Administrative Procedure Act § 303). No single standard determines whether an administrative decision maker should disqualify himself from a proceeding for lack of impartiality (see, 3 Davis, Administrative Law § 19:1 [2d ed 1978]). Many concepts are embraced under the heading of bias, including advance knowledge of facts, personal interest, animosity, favoritism and prejudgment. Not all require disqualification in all circumstances. Disqualification is more likely to be required where an administrator has a preconceived view of facts at issue in a specific case as opposed to prejudgment of general questions of law or policy (see, id., §§ 19:2, 19:4).
*162 For example, administrative officials are expected to be familiar with the subjects of their regulation and to be committed to the goals for which their agency was created. Thus, a predisposition on questions of law or policy and advance knowledge of general conditions in the regulated field are common, and it is expected that they will influence an administrator engaged in a legislative role such as rule making (see, Association of Natl. Advertisers v Federal Trade Commn., 627 F2d 1151, 1168-1169 [DC Cir]; see generally, 1 Koch, Administrative Law and Practice § 6.7 [1985]). Similarly, mere familiarity with the facts of a pending proceeding or taking a public position on a policy issue related to the proceeding have been held insufficient to require disqualification (Hortonville Dist. v Hortonville Educ. Assn., 426 US 482).
On the other hand, disqualification may be required for prejudgment of specific facts at issue in an adjudicatory proceeding (Kennecott Copper Corp. v Federal Trade Commn., 467 F2d 67, 80 [10th Cir]; Cinderella Career & Finishing Schools v Federal Trade Commn., 425 F2d 583, 591 [DC Cir]). It has been noted, moreover, that public statements that indicate prejudgment are especially problematic. While conscientious officials are presumably able to put aside privately held prejudgments, public statements touching on the facts of a proceeding create special problems. Such statements "may have the effect of entrenching [the official] in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record.” (Cinderella Career & Finishing Schools v Federal Trade Commn., supra, at 590.)
Thus, where, as in this case, an administrative official has made public comments concerning a specific dispute that is to come before him in his adjudicatory capacity, he will be disqualified on the ground of prejudgment if " 'a disinterested observer may conclude that [he] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.’ ” (Cinderella Career & Finishing Schools v Federal Trade Commn., supra, at 591 [quoting Gilligan, Will & Co. v Securities & Exch. Commn., 267 F2d 461, 469 (2d Cir)]; see, Kennecott Copper Corp. v Federal Trade Commn., supra, at 80; Texaco, Inc. v Federal Trade Commn., 336 F2d 754, 760 [DC Cir].)
III.
Under this standard, Chairman Duffy was disqualified from *163 participating in the SLA proceeding against petitioner. During his testimony before the Senate committee overseeing SLA operations, the committee chairman brought up the issue of underage drinking, introducing it as follows:
"senator Goodman: One case in particular that I’d like to use to exemplify the problem has become rather notorious. It’s the case of a bar called Dorian’s [sic] at number 1616 Second Avenue in New York City.
* * *
"It’s my impression that, despite the issuance of four summons by the police task force and your intervention on several occasions, that absolutely nothing of any use has occurred in preventing the sale to under age people”.
After noting that charges were pending before the SLA on the matter, the Chairman responded:
"chairman duffy: The summonses were served. It turns out that three of the people who were drinking and under age in that premises live outside the state of New York. One lives in Europe, and two are college students who don’t live here. We have one who is a person who lives in New York, and the summonses have been dismissed in Criminal Court, I think for lack of prosecution and what I am trying to do at the State Liquor Authority is to bring to bear on these kind of charges some innovative ways of establishing guilt by substantial evidence.
"For example, I’m not satisfied to say that in the Dorian case, we will dismiss our proceedings against that establishment because we can’t bring in the people who are outside the state. What I’m trying to do, and the reason that we’re taking our time to do this is, I’m trying to come up with alternate ways to establish by a substantial evidence that in fact there was an under age person who consumed and was served alcoholic beverages at that location
* * *
"[A]s far as Dorian’s is concerned, I think that I’m doing a great job in the Dorian’s matter because I am going to bring Dorian’s to justice without begging off and saying, Well, they’re outside the state and I can’t proceed, and I want to make a record in Dorian’s case and, if I can make a record *164 that’s going to establish that they sold drinks to minors — and that’s what we need, a record — there are people that complain. They [know] that these people are less than 21, and I simply can’t do it on somebody’s conjecture that this person is less than 21. I’ve got to have a record.
"I’m in the process of compiling that record and we’re going to be in the process of being able to report to you the results of hearings and board votes with respect to that”.
Viewed as a whole, this testimony could only be regarded by a disinterested observer as evidencing Chairman Duffy’s belief that petitioner had in fact violated the law regarding the sale of alcohol to minors and his commitment to establishing that fact in the SLA proceeding. His remarks contain no hint that the charges might turn out to be unfounded. From all that appears, the only question in the Chairman’s mind was not whether petitioner was guilty, but whether the SLA would be hamstrung in their efforts to establish guilt because some of the witnesses lived out of State.
We understand that the Chairman was in a somewhat hostile environment — Senator Goodman made it clear that he believed that the SLA had not responded adequately to the problem of underage drinking in general and Dorrian’s in particular. It is possible, therefore, that Chairman Duffy was simply appeasing his overseers with his assurances that Dorrian’s would be brought to justice, and was not reflecting his actual prejudgment of petitioner’s guilt.
But whether or not he had actually prejudged the matter, his statements nonetheless gave the impression that he had, and that impression lent an impermissible air of unfairness to the proceeding. More importantly, those statements and the message they conveyed to a "disinterested observer” established the Chairman’s public position on the issue. Whether or not he believed petitioner to be guilty when he made the statements, his public alignment with that position, especially in front of the Senate committee that oversees his agency’s operations, might have made it more difficult to reach a contrary conclusion in the adjudicatory proceeding. In effect, to find petitioner innocent would require a public confession of error by the Chairman. That is an impermissible burden to place on petitioner.
We do not hold that every appearance of impropriety in administrative adjudications violates due process. The rule of law we apply, which is well established in the Federal courts, *165 is limited to situations in which an administrative official has taken a public position about specific facts at issue in a pending adjudicatory proceeding. It is true that the decisions of the Federal Circuit Courts of Appeal are not binding on us. In matters of administrative law, however, there is perhaps no court more experienced than the District of Columbia Circuit, which authored the leading decision applying the test we adopt (see, Cinderella Career & Finishing Schools v Federal Trade Commn., 425 F2d 583, supra). We find that decision and the others cited persuasive, not merely because of their source, but also because of their logic.
Nor do the United States Supreme Court cases cited by the dissent require a different rule. None of them deal with public statements indicating prejudgment of adjudicative facts.
Withrow v Larkin (421 US 35, supra), for example, dealt with a claim that the combination of investigative and adjudicative functions by itself violated due process. Trade Commn. v Cement Inst. (333 US 683) concerned a claim that the Commission had prejudged a legal, rather than factual question — whether a particular pricing system violated the Sherman Act (see, 3 Davis, Administrative Law § 19:2, at 372-373 [2d ed]). Similarly, National Labor Relations Bd. v Donnelly Co. (330 US 219) dealt with alleged prejudgment of a legal issue — the admissibility of certain evidence (see, 3 Davis, op. cit., § 19:2, at 376). The Supreme Court has itself noted that the cases involving public statements indicating prejudgment of facts involve different considerations (see, Withrow v Larkin, supra, at 50-51, n 16 [citing e.g., Texaco, Inc. v Federal Trade Commn., 336 F2d 754, supra; and Cinderella Career & Finishing Schools v Federal Trade Commn., 425 F2d 583, supra]).
Finally, we do not fault the Chairman for responding as he did to the questions put to him. His agency is accountable to the Legislature and he therefore has an obligation to respond to their inquiries. Having done so, however, especially in terms that pronounced petitioner’s guilt, he was obligated to recuse himself from the adjudicatory proceeding.
Inasmuch as the findings of the Administrative Law Judge are not compromised by the Chairman’s apparent prejudgment, the proper remedy is reconsideration of those findings, without the participation of the Chairman, by the remainder of the SLA Commissioners.
Accordingly, the judgment of the Appellate Division should *166 be reversed and the petition granted to the extent of annulling the determination and remitting to the State Liquor Authority for further proceedings in accordance with this opinion.