601 S.E.2d 55

**MARFORK COAL COMPANY,**
Petitioner Below, Appellee

v.

**Michael O. CALLAGHAN, Secretary, West Virginia Department of Environmental Protection, and Matthew B. Crum, Director, West Virginia Department of Environmental Protection's Division of Mining and Reclamation, Respondents Below,**

and

**Janice Nease and Freda Williams, Intervenors Below, Appellees.**

**Stephanie R. Timmermeyer, Acting Secretary, West Virginia Department of Environmental Protection, Appellant.**

No. 31551.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 10, 2004.

Decided March 15, 2004.

Concurring Opinion of Justice McGraw June 30, 2004.

Dissenting Opinion of Chief Justice Maynard July 6, 2004.

Concurring Opinion of Justice Starcher July 14, 2004.

---

Maynard, C.J., dissented and filed opinion.

Starcher, J., concurred and filed opinion.

Mcgraw, J., concurred and filed opinion.

Robert G. McLusky, Gale R. Lea, John Charles (Max) Wilkinson, Jr., Jackson & Kelly, Charleston, West Virginia, Attorneys for the Appellee, Marfork Coal Company.

Thomas L. Clarke, West Virginia Department of Environmental Protection, Charleston, West Virginia, Attorney for the Appellant.

Freda Williams, Pro Se.

ALBRIGHT, Justice:

The West Virginia Department of Environmental Protection ("DEP"), through its Secretary, Stephanie R. Timmermeyer,[1] appeals from the December 23, 2002, order of the Circuit Court of Raleigh County through which an order of the West Virginia Surface Mine Board ("SMB") was reversed and the underlying matter remanded to DEP for a second show cause hearing on the issue of whether Marfork Coal Company ("Marfork") should be subject to a permit revocation or suspension based on an alleged pattern of violating state surface mining regulations.

---

1. Ms. Timmermeyer succeeded Michael O. Callaghan, who was the DEP Secretary during the proceedings below.

Rather than addressing the substance of the appeal, the circuit court resolved the appeal primarily on procedural grounds that relate to the original show cause proceeding before the DEP. Having thoroughly reviewed this matter, we find that the lower court committed error by focusing its appellate review almost exclusively on the DEP show cause proceeding rather than on the SMB proceeding and ruling which were the proper subject of its review as set forth by statute.[2] Accordingly, we reverse and remand this matter to permit the circuit court to address the substantive issues Marfork raised in its appeal from the DEP ruling upon which the lower court has not yet ruled.

## I. Factual and Procedural Background

On June 7, 2001, DEP issued an order requiring Marfork to show cause as to why its permit number O-3010-95,[3] which governs the operations of a surface mine in Raleigh County and a coal refuse disposal facility known as Brushy Fork, should not be suspended or revoked based on an alleged pattern of violations of state surface mining regulations.[4] Prior to the show cause hearing, DEP announced in a press release issued on August 31, 2001, that three Massey subsidiaries, of which Marfork was one, faced show cause hearings in connection with "patterns of water pollution discharges." In the press release, DEP Director Mathew B. Crum ("Director Crum") is quoted as saying that the violations committed at the Brushy Fork impoundment were "serious" and that the show cause "method of enforcement has a much greater potential for getting an operator's attention and compelling compliance."

On October 25, 2001, the show cause hearing was conducted with Director Crum serving as the hearing examiner. Three citizen intervenors[5] made statements in support of DEP's action against Marfork. The parties, including the intervenors, were allowed to introduce witness testimony; fully cross examine the witnesses; and proffer demonstrative evidence bearing on the issues presented. By order dated January 14, 2002, Director Crum ruled that Marfork had failed to meet its burden of showing why the permit at issue should not be suspended based on the pattern of statutory violations at issue. Accordingly, the DEP Director found that a fourteen day suspension of the permit was warranted for Marfork's pattern of violating surface mining laws. Marfork appealed the DEP ruling to the SMB and obtained a stay of the order issued by the DEP.

A *de novo* evidentiary hearing[6] took place before the SMB on March 13, 2002, during which the SMB considered the same evidence previously presented to the DEP on the issue of the pattern of violations, as well as additional evidence presented by Marfork in support of its allegation that Director Crum was biased against it and had prejudged the case. By order dated June 27, 2002, the SMB upheld the DEP's decision that the evidence warranted a suspension of the subject surface mining permit, but modified the penalty by reducing the fourteen-day suspension period ordered by DEP to a nine-day suspension period. In addition, after concluding that the mining operations had not contributed to the pattern of violations at issue, the SMB eliminated the surface mine operations from the effect of the suspension.[7] With regard to the newly raised issues of bias and prejudgment, the SMB essentially dismissed these concerns based on its *de novo* hearing of the issues presented.[8] Mar-

---

2. *See* W.Va.Code § 22B-1-9 (1994) (Repl.Vol. 2002).

3. The permit was issued on November 28, 1995.

4. *See* W.Va.Code § 22-3-17(b) (1997) (Repl.Vol. 2002).

5. Freda Williams, Janice Nease, and Pauline Canterbury.

6. Under the provisions of West Virginia Code § 22B-1-7(e) (1994) (Repl.Vol.2002), the SMB proceeding is *de novo*. *See* Syl. Pt. 2, *West Virginia DEP v. Kingwood Coal Co.*, 200 W.Va. 734,

736, 490 S.E.2d 823, 825 (1997) (holding that SMB reviews DEP final decisions *de novo* and that SMB "is not required to afford any deference to the DEP decision").

7. Consequently, only the coal refuse disposal facility was subject to the suspension period ordered by the SMB.

8. In its order, the SMB stated:

While the Board has concluded that the *de novo* hearing it has afforded Marfork cures the procedural defects Marfork alleges occurred in

fork appealed the decision of the SMB to the circuit court.

After hearing oral argument on the appeal and considering the entire administrative record, the circuit court determined that Marfork's procedural due process rights were violated by virtue of Director Crum serving as the hearing examiner in the show cause hearing.[9] Rejecting the DEP's position that the *de novo* nature of the SMB proceeding "cured" any procedural irregularities at the show cause hearing, the circuit court reversed the SMB ruling and remanded the matter to DEP for "a full show cause hearing on the merits before an impartial hearing examiner."

Arguing that the circuit court violated established administrative review procedures in focusing its review on the DEP ruling rather than on the SMB ruling, DEP seeks a reversal of the lower court's ruling.

## II. Standard of Review

Our review of the circuit court's decision in an administrative appeal is *de novo. See Tennant v. Callaghan,* 200 W.Va. 756, 761, 490 S.E.2d 845, 850 (1997). In conducting that review, however, we are subject to the same governing standards of review that controlled the circuit court's actions. *West Virginia DEP v. Kingwood Coal Co.,* 200 W.Va. 734, 736, 490 S.E.2d 823, 825 (1997). Those standards, which are set forth in West Virginia Code § 29A–5–4(g) (1998) (Repl.Vol.2002), provide for reversal, vacation, or modification of an administrative decision when the petitioner's rights have been substantially prejudiced as a result of a ruling that is:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedures; or

(4) Affected by other error of law; or

(5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* With these standards in mind, we proceed to examine this matter to determine whether the lower court committed error in its reversal of the SMB ruling.

## III. Discussion

DEP argues that the circuit court exceeded the scope of its statutory authority of review by relying on procedural errors that took place at the DEP proceeding as the basis for its reversal of the SMB ruling. In its December 23, 2002, order, the circuit court focused almost exclusively on what had taken place in the show cause hearing before Director Crum. In summary fashion, the lower court concluded that the press release "strongly indicates that Director Crum prejudged Marfork." Without identifying any specific statements attributed to Director Crum that demonstrated such prejudgment, however, the lower court simply referenced the press release as the entirety of the evidence upon which it relied to conclude that Director Crum was biased against Marfork. The only finding which the trial court made in relation to the SMB proceeding pertained to the burden of proof borne by Marfork. After syllogizing that if Director Crum had not been the DEP hearing examiner, then an impartial hearing would have taken place and Marfork would not have had reason to appeal the penalty,[10] the trial court concluded that Marfork was wrongly required to bear the burden of production and proof before the SMB. Upon analysis, neither one of the bases

the DEP's show cause procedure, including bias, prejudgement [sic] and lack of due process, the Board believes the fact that Director Crum acted as his own hearing examiner somewhat taints the sanction he decided to impose for the pattern of violations. Therefore, the Board has concluded that substantial evidence warrants reduction of the length of the permit suspension imposed by the DEP.

9. In making this ruling, the circuit court found that Marfork was denied a fair and impartial hearing based on "Director Crum's pre-hearing public statements [press release] and demonstrated knowledge of extra-record evidence."

10. Either because Marfork would have prevailed or chosen not to appeal in light of a less severe penalty.

relied upon by the circuit court withstands scrutiny.

## A. DEP DIRECTOR AS HEARING EXAMINER

We first examine whether the fact that Director Crum was .the hearing examiner impermissibly tainted the show cause proceeding simply by virtue of the dual position he held as both DEP Director and administrative fact finder. After acknowledging that it could "find no West Virginia authority directly on point as to the constitutional implications of a biased or prejudiced administrative hearing officer," the trial court proceeded to look to non-administrative law precedent as support for its position that a violation of the constitutional right of due process occurred here solely as a result of Director Crum's dual role as DEP Director and hearing examiner combined with his statements in the DEP press release.

■ In fashioning the relief it ordered, the circuit court avoided any discussion of the statutory authority that irrefutably authorizes Director Crum to sit as the hearing examiner in the DEP show cause proceeding. Under West Virginia Code § 29A–5–1(d) (1964) (Repl.Vol.2002),

> All hearings shall be conducted in an impartial manner. *The agency, any member of the body which comprises the agency, or any hearing examiner or other person permitted by statute to hold any such hearing for such agency,* and duly authorized by such agency so to do, shall have the power to: (1) Administer oaths and affirmations, (2) rule upon offers of proof and receive relevant evidence, (3) regulate the course of the hearing, (4) hold conferences for the settlement or simplification of the issues by consent of the parties, (5) dispose of procedural requests or similar matters, and (6) take any other action authorized by a rule adopted by the agency

in accordance with the provisions of article three [§ 29A–3–1 et seq.] of this *chapter. Id.* (emphasis supplied).

■ Based on the language of West Virginia Code § 29A–5–1(d), there is clear authority for the DEP director—as a *member* of that administrative agency—to serve as a hearing officer in an administrative proceeding.[11] In the decision of *Varney v. Hechler,* 189 W.Va. 655, 434 S.E.2d 15 (1993), we rejected the argument that the Deputy Secretary of State could not serve as an impartial hearing examiner in a case involving an appeal from a final decision of the Secretary of State which revoked a notary public's commission. In resolving whether an agency member could serve as an administrative hearing examiner without a conflict of interest, we looked at the provisions of West Virginia Code § 29A–5–1(d), and commented that "the use of the term 'agency' in the statute ... certainly reflects a legislative intent 'that the people at the top [of a given agency] are entitled to serve as presiding officers in contested cases....'" 189 W.Va. at 660, 434 S.E.2d at 20 (quoting Alfred S. Neely, IV, *Administrative Law in West Virginia* § 5.26 at 320 (1982)). Recognizing that judicial review serves as the necessary protection to guarantee that an administrative hearing is impartial in nature,[12] we held in syllabus point two of *Varney* that:

> By its express terms, West Virginia Code § 29A–5–1(d) (1993) permits an administrative agency to designate any member within the agency to preside as a hearing examiner and requires that such hearing be conducted in an impartial manner. No inherent conflict of interest is created simply because such agency member serves as a hearing examiner."

189 W.Va. at 657, 434 S.E.2d at 17.

In light of the clear statutory authority set out in West Virginia Code § 29A–5–1(d) and this Court's holding in *Varney,* the analytical approach adopted by the circuit court to reach its conclusion that the administrative

11. While we do not necessarily view such practice as prudent in all circumstances, it is nonetheless authorized by statute. In fact, the DEP ceased having Director Crum serve as a hearing examiner very shortly after it began this practice.

12. Administrative proceedings are required to be conducted in an impartial manner under the provisions of West Virginia Code § 29A–5–1(d).

show cause hearing was not an impartial proceeding is flawed *ab initio*. In addition to its presumption that the show cause hearing lacked the necessary impartiality[13] to survive constitutional scrutiny based solely on Director Crum's involvement in the proceedings, the lower court overlooked the unique posture that a show cause proceeding presents, especially one like that before us which involves a string of established statutory violations from which no appeal was taken. By disregarding the critical distinctions between a show cause proceeding and an initial fact-gathering and issue determinative administrative hearing, the circuit court failed to appreciate both the narrow scope of the show cause hearing and the permissible nature of pre-hearing administrative involvement with matters of this nature.

In stark contrast to a prototypical fact-finding administrative hearing, the show cause hearing contemplated by the provisions of West Virginia Code § 22–3–17(b) has as a factual predicate the commission of prior statutory violations. The pertinent language of this provision states that:

> (b) If the director determines that a *pattern of violations of any requirement of this article or any permit condition exists or has existed,* as a result of the operator's lack of reasonable care and diligence, or that the violations are willfully caused by the operator, the director shall immediately issue an order directing the operator to show cause why the permit should not be suspended or revoked and giving the operator thirty days in which to request a public hearing. If a hearing is requested, the director shall inform all interested parties of the time and place of the hearing. Any hearing under this section shall be recorded and is subject to the provisions of

chapter twenty-nine-a [§§ 29A–11–1 et seq.] of this code. Within sixty days following the public hearing, the director shall issue and furnish to the permittee and all other parties to the hearing a written decision, and the reasons therefor, concerning suspension or revocation of the permit. Upon the operator's failure to show cause why the permit should not be suspended or revoked, the director shall immediately suspend or revoke the operator's permit.

W.Va.Code § 22–3–17(b) (emphasis supplied).

In this particular case, Marfork had been cited and fined[14] for six prior violations of the West Virginia Surface Coal Mining and Reclamation Act (the "Act"). *See* W.Va.Code §§ 22–3–1 to –32 (1994) (Repl.Vol.2002). Critically, Marfork took no appeal from any of the six statutory violations which the DEP relied upon in its show cause order to constitute the requisite "pattern" of violations. W.Va.Code § 22–3–17(b). Under the provision of the Act at issue, the purpose of the show cause hearing is to provide the surface mine permittee the opportunity to demonstrate why the selected violations do not qualify as a "pattern;"[15] that the violations did not result from the "operator's lack of reasonable care and diligence;" or that the violations were not caused in a willful manner. *Id.; see* W.Va. R. *Environmental Protection* 38 § 2–20.4.a. The show cause hearing does not, however, involve any factual determinations regarding the underlying and preexisting statutory violations which comprise the alleged pattern of statutory violations for which the DEP is seeking a separate and distinct remedy from the initial fine that was assessed in conjunction with each separately noticed violation.[16]

---

**13.** *See supra* note 12.

**14.** Under West Virginia Code § 22–3–17(a), that fine is set at not less than $750 per day per violation when a permittee fails to abate the noticed violation within the specified period of time provided by the DEP.

**15.** Under state regulations, a pattern of violations can be averred upon as few as two violations within a twelve-month period. *See* W.Va. R. *Environmental Protection* 38 § 2–20.4.b.

**16.** It was suggested during oral argument that the penalty of suspension or revocation that is attached to the pattern of statutory violations under West Virginia Code § 22–3–17(b) is inappropriate because it negatively impacts on the employees of the permittee by causing them to incur a loss of pay. While we certainly recognize this apparent injustice that befalls upon the innocent employees of the permittee, the statute does not provide an alternative such as fines for a pattern of statutory violations. *See id.* The decision to impose only suspension or revocation of a

Only by acknowledging the limited focus of the show cause hearing that is extended to permittees who have already violated the Act on multiple occasions, can the due process concerns identified by the circuit court be placed in their proper perspective. As discussed above, the use of a member of an administrative body, including the director of the administrative agency, as a hearing officer to take evidence in a proceeding that involves alleged violations of laws subject to the agency's enforcement does not on its own constitute, or even indicate, a proceeding that lacks the necessary impartiality to meet fundamental due process concerns where such use is specifically authorized by statute. The only evidence upon which the circuit court relied to find a due process violation, other than Director Crum's presence as the hearing examiner, was the press release statements specifically attributed to Director Crum. Not only do the statements included in that press release involve nothing more than factual recitations of the preexisting prior violations of Marfork and the department's intention to rely upon the law to address the continuing pattern of those offenses, they fail to constitute any evidence that the forthcoming show cause

hearing would deprive Marfork of the due process protections to which it is entitled under the law.[17] *See Clarke v. West Virginia Bd. of Regents,* 166 W.Va. 702, 710, 279 S.E.2d 169, 175 (1981) (defining minimal procedural due process protections as including " 'formal written notice of charges; sufficient opportunity to prepare to rebut the charges; opportunity to have retained counsel at any hearings on the charges, to confront his accusers, and to present evidence on his own behalf; an unbiased hearing tribunal; and an adequate record of the proceedings' ") (quoting Syl. Pt. 3, in part, *North v. West Virginia Bd. of Regents,* 160 W.Va. 248, 233 S.E.2d 411 (1977)).

The press release statements attributed to Director Crum were that the violations Marfork committed at the Brushy Fork impoundment were "serious" and that the show cause "method of enforcement has a much greater potential for getting an operator's attention and compelling compliance."[18] Nothing in these two statements suggests that the DEP would deny Marfork its constitutional right to a fair hearing. Other than evidencing the DEP's intention to fully prosecute violations of this state's surface mining laws within the boundaries of the law,[19] the press release

---

permit as the penalty for a *pattern* of statutory violations is a legislative one, and it is for the Legislature, not this Court, to determine if the statutory scheme of fines and permit suspension or revocation provides sufficient deterrence against prohibited conduct. *See* W. Va.Code § 22–3–17(a); *see also* W.Va. R. *Environmental Protection* 38 § 2–20.7 (setting forth assessment rates for civil penalties levied in connection with seriousness of violations of W.Va.Code § 22–3–17(a)). Where the permit is revoked, the permittee also forfeits the amount of the operator's bond that is required to be posted under West Virginia Code §§ 22–3–11 and –12 (2001) (Repl. Vol.2002).

By separate provision, however, the legislature did provide for the civil penalty of up to $5,000 per day for each violation of "any permit condition; ... any *other* provision of this article [chapter 22, article 3] or rules promulgated pursuant thereto...." W.Va.Code § 22–3–17(c) (emphasis supplied). Even if this maximum per diem fine had been assessed in this case, that amount does not approach the level of economic deprivation in the form of lost profits that is realized by the permittee when the penalty of permit suspension or revocation is imposed.

17. We have recognized that due process in the civil context "is a flexible concept which requires

courts to balance competing interests in determining the protections to be accorded one facing a deprivation of rights." *Clarke v. West Virginia Bd. of Regents,* 166 W.Va. at 710, 279 S.E.2d at 175; *see also Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 483, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (commenting that "no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause").

18. *See In re 1616 Second Ave. Restaurant, Inc. v. New York State Liquor Auth.,* 75 N.Y.2d 158, 551 N.Y.S.2d 461, 550 N.E.2d 910, 912 (1990) (recognizing that "administrative officials are expected to be familiar with the subjects of their regulation and to be committed to the goals for which their agency was created" and acknowledging their consequent "predisposition on questions of law or policy and advance knowledge of general conditions in the regulated field").

19. The press release includes the additional statement attributed to Director Crum that "[t]hese three companies have failed to operate and maintain their facilities in accordance with state law and we are taking the actions necessary to prevent future violations."

merely discloses the identity of the three Massey companies that are subject to additional agency action in connection with their alleged patterns of violating this state's mining laws. Consequently, the circuit court's reliance upon these statements of Director Crum as indicative of bias rising to the level of constitutional significance is questionable, especially when the underlying violations that comprise the alleged pattern have already been established and the companies involved failed to take appeals from those violations.

■ In concluding that the press release evidences that Director Crum had wrongly gained access to extra-record evidentiary evidence, the circuit court is mistaken. Apparently, the lower court took the position that if Director Crum had any preexisting knowledge of the DEP's investigation and actions involving Marfork prior to the show cause hearing, this knowledge would tend to suggest that Director Crum had necessarily prejudged the issues that were to be presented and ruled upon at the hearing. This position, however, fails to recognize that administrative law proceedings routinely involve some degree of permissible pre-hearing knowledge on the part of the hearing examiners.[20]

In *Morris v. City of Danville,* 744 F.2d 1041 (4th Cir.1984), the Fourth Circuit Court of Appeals squarely addressed the issue of whether a city manager who had made the initial conditional decision to terminate a police chief was subsequently disqualified from serving as the hearing officer at the termination hearing. In rejecting the police chief's contention that he had been denied an impartial decisionmaker, the federal appellate court reasoned:

> [W]e do not agree that under the circumstances of this case Church [city manager] ceased to be an impartial decisionmaker simply by virtue of having made a conditional decision to terminate Morris [police chief] pending further developments in an administrative process [which] had not then closed.

Administrative decisionmakers, like judicial ones, are entitled to a "presumption of honesty and integrity," *see Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), and absent a showing of bias stemming from an "extrajudicial source," they are not constitutionally precluded from making the determination that they are directed to make by their employer. *See generally Bowens v. North Carolina Department of Human Resources,* 710 F.2d 1015, 1020 (4th Cir. 1983) ("To be disqualifying, personal bias must stem from a source other than knowledge a decision maker acquires from participating in a case"). On the record we review, that presumption has not been overcome by any showing of bias stemming from sources outside the decisional process.

744 F.2d at 1044–45.

As support for its decision in *Morris,* the Fourth Circuit cited its earlier decision in *Duffield v. Charleston Area Medical Center, Inc.,* 503 F.2d 512 (4th Cir.1974), a case which involved the issue of whether a physician's procedural due process rights were violated when the members of the hospital's governing board who initially decided to revoke his privileges were permitted to sit on the joint conference committee who made the final decision regarding his privileges. In concluding that no " 'extrajudicial' bias" resulted as a result of the dual role held by the individuals who sat on both the governing board and the joint conference committee, the appellate court stated that the actions of the governing board were " 'simply a step, largely a procedural one at that, in the administrative resolution of the proceedings involving the appellant' " and further that the "decision taken was purely tentative and conditional." *Id.* at 1045 (quoting *Duffield,* 503 F.2d at 518–19). In likening the conditional termination taken by the city manager in *Morris* to the initial decision to revoke hospital privileges in *Duffield,* the Fourth Circuit made the following salient observation:

---

**20.** Director Crum began his employment with DEP one week after the show cause order had been issued to Marfork. He testified that he built a "Chinese wall" around himself with regard to the Marfork proceeding.

The mere fact that an administrator knows of the charges against an employee, and is aware that the charges are serious enough to result in the employee's discharge, cannot automatically, as a matter of constitutional law, preclude the administrator's further participation in the proceedings. If such were the case, it is difficult to imagine what administrative decisionmaker would not be disqualified from deciding the questions involved. Church's initial decision to terminate Morris was tantamount to a "show cause" order, which notified Morris both of the extensive factual issues to be resolved at the hearing and of their seriousness.

503 F.2d at 1045, n. 7; *accord Hortonville Jt. Sch. Dist. v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) (stating that "[m]ere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not ... disqualify a decisionmaker"); *see also FTC v. Cement Institute,* 333 U.S. 683, 701, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (stating that "the fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject").

In rejecting the argument that the city manager's initial decision to conditionally terminate the chief of police disqualified him from further participation in the termination proceedings, the Fourth Circuit recognized that the conditional decision to terminate merely reflected the city manager's opinion, based on an internal investigative report concerning the police chief, that the allegations contained in such report "were sufficient cause to terminate Morris's employment *if he did not refute them at the hearing.*" 744 F.2d at 1045 (emphasis supplied). The initial decision, which the appellate court likened to a show cause order, "was akin to a preliminary finding and did not reflect an irrevocable position on the merits taken after a full adversary proceeding." *Id.* at 1046, n. 8.

The *Morris* decision completely dispels the circuit court's concern regarding the so-called "extra-record" knowledge that Director Crum had of the Marfork matter. In addition to acknowledging that most administrative decisionmakers will have some pre-hearing knowledge of the matters which they are required to decide, the Fourth Circuit made clear in *Morris* that the bias necessary to implicate constitutional due process concerns does not arise from this type of pre-hearing familiarity with a case. Instead, the type of bias that is constitutionally impermissible must emanate from an " 'extra-judicial" ' source, which the appellate court defined as "a source *other than* ... [the decisionmaker's] prior participation in the administrative process." 744 F.2d at 1046 (emphasis supplied). In this case, the bias that suggested to the lower court "extra record" involvement on Director Crum's part appears to stem solely from the statements made by Director Crum in the press release. As discussed above, these statements merely indicate an awareness of the forthcoming show cause hearing; the seriousness of the charges; and the DEP's position regarding enforcement of this state's surface mining laws. They clearly do not evidence the type of "extra-judicial" involvement or bias which signals possible due process violations under *Morris. Id.*

When confronted with the dual roles held by an administrative fact finder, the United States Supreme Court held in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), that "[t]he combination of investigative and adjudicative functions does not, without more, constitute a due process violation as creating an unconstitutional risk of bias." *Id.* at 36, 95 S.Ct. 1456. The high court observed that " '[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process....' " 421 U.S. at 52, 95 S.Ct. 1456 (quoting 2 K. Davis, *Administrative Law Treatise* § 13.02, p. 175 (1958)). Firmly rejecting the argument that a state examining board statutorily charged with the enforcement of various statutes dealing with the practice of medicine could not conduct a hearing on physician misconduct charges following an initial investigation that resulted in the temporary suspension of privileges, the United States Supreme Court stated in *Withrow:*

No specific foundation has been presented for suspecting that the Board had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. *The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing.* Without a showing to the contrary, state administrators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

421 U.S. at 55, 95 S.Ct. 1456 (emphasis supplied).

 Because the only evidence relied upon by the circuit court as indicative of bias on the part of Director Crum is the press release statements, we are compelled to reach the same decision as that reached by the high court in *Withrow:* this evidence indicates *at best* "mere exposure to evidence presented in nonadversary investigative procedures." *Id.* Without something more,[21] the circuit court has failed to identify a sufficient foundation of bias on the part of Director Crum that would implicate the denial of constitutionally required principles of due process. Having found no evidence of a denial of procedural due process, we need not reach the issue of whether the SMB proceeding effectively "cured" any due process violation that may have taken place at the DEP show cause hearing.[22]

## B. Burdens of Proof

Although our state surface mining laws and regulations do not specify the specific evidentiary burdens that are to be borne by the parties in connection with the issue of permit suspension or revocation, federal regulations adopted by the Office of the Secretary of the Interior identify the burdens of proof applicable in such proceedings. Based on the fact that West Virginia's surface mining laws are required to be "at least as stringent as those provided for in the federal act," the parties accept as controlling the burdens set forth in 43 C.F.R. § 4.1194. *Canestraro v. Faerber,* 179 W.Va. 793, 794, 374 S.E.2d 319, 320 (1988). Under 43 C.F.R. § 4.1194 (2002), the following burdens are delineated:

> In proceedings to suspend or revoke a permit, OSM [Office of Surface Mining] shall have the burden of going forward to establish a prima facie case for suspension or revocation of the permit. The ultimate burden of persuasion that the permit should not be suspended or revoked shall rest with the permittee.

**21.** An example of the additional type of bias evidence that is required would be evidence that the hearing examiner stood to benefit financially from the result that was reached. *See Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (holding that mayor whose village revenues were comprised of between one-third to one-half of levied traffic fines could not be impartial hearing examiner); *cf. Commonwealth of N. Mariana Islands v. Kaipat,* 94 F.3d 574 (9th Cir.1996) (rejecting contention that statute earmarking civil and criminal fines for judicial building fund created improper incentive for levy of fines). Besides a direct pecuniary interest in the outcome of the proceedings, another basis for disqualifying a hearing officer exists when the decision maker has strong institutional responsibilities requiring him or her to rule in the institution's favor. *See Tumey v. Ohio,* 273 U.S. 510, 532–33, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Where it can be shown that the administrative law judge prejudged the specific facts at issue in an adjudicatory proceeding, disqualification of such individual would be required for lack of impartiality. *See Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 80 (10th Cir. 1972); *see also New York State Liquor Auth.,* 551 N.Y.S.2d 461, 550 N.E.2d at 912 (recognizing that administrative official who made public comments concerning specific dispute will be disqualified on grounds of prejudgment if disinterested observer would conclude that official adjudged both facts and law in advance of hearing matter).

**22.** We do recognize, however, that the United States Supreme Court in *Village of Monroeville* rejected the argument that a *de novo* appellate proceeding could cure any procedural errors that took place in the initial proceeding, holding that the "[p]etitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61–62, 93 S.Ct. 80; *accord Concrete Pipe & Products v. Constr. Laborers Pension Trust,* 508 U.S. 602, 617–18, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

■ Arguing that DEP failed to meet its burden of establishing a *prima facie* case for permit suspension at the SMB hearing, Marfork contends that a wrongful shifting of evidentiary burdens resulted. Upon a review of the record, this contention is not supported by what took place at the proceedings below. In both proceedings, the DEP show cause hearing and the SMB appellate proceeding, the burden was squarely on the shoulders of the DEP to first demonstrate a *prima facie* case for suspension or revocation. As part of making its *prima facie* case, DEP implicitly established that the DEP Director made a determination by its decision to prosecute that the subject pattern of statutory violations demonstrates conduct on the part of the operator that was either "willful" or was devoid of "reasonable care and diligence." W.Va.Code § 22–3–17(b). DEP argues that it met its burden in both instances based on the introduction of its Exhibit 1, which it designated its "show cause package." This "show cause package" included Marfork's six violations of this state's surface mining laws,[23] all of which took place within a seven-month period. By the time the show cause hearing was held, the period for Marfork to contest these six violations, including the assessment of civil penalties, had passed without any appeals having been taken. Consequently, the violations were viewed as final within the administrative schema.

Asserting that its only burden with regard to demonstrating a *prima facie* case for suspension or revocation was to introduce evidence that documented a minimum of two established violations of this state's surface mining laws within the previous twelve-month period,[24] DEP argues that it met its burden of proof based on the introduction of Exhibit 1 at the show cause hearing, which was included as a part of the record on appeal to the SMB. Given that Marfork never challenged the individual statutory violations that comprise the alleged "pattern" of violations for which DEP was seeking the additional statutory relief of suspension or

revocation, we would be hard pressed to find that the DEP failure to separately introduce Exhibit 1, or its "show cause package," at the SMB proceeding somehow wrongly forced Marfork to take on additional evidentiary burdens that it otherwise did not have. Upon the basic introduction of a *prima facie* case, in this case established by evidence of only two prior statutory violations, the burden immediately shifts to the permittee to produce evidence refuting the evidence introduced by the DEP. The burden of production is squarely on the shoulders of the permittee following the introduction of the *prima facie* evidence of statutory violations. And, as the federal regulation makes clear, and no one disputes its application to this case—"[t]he ultimate burden of persuasion that the permit should not be suspended or revoked shall rest with the permittee." 43 C.F.R. § 4.1194.

■ To support its position on the improper burden shifting, Marfork stresses the *de novo* nature of the SMB proceeding. *De novo* review by the SMB is clearly required by this Court's holding in syllabus point two of *Kingwood Coal*, wherein we held:

Appeals of a final agency decision issued by the director of the division of environmental protection shall be heard *de novo* by the surface mine board as required by *W.Va.Code*, 22B–1–7(e) [1994]. The board is not required to afford any deference to the DEP decision but shall act independently on the evidence before it.

200 W.Va. at 736, 490 S.E.2d at 825. Attempting to use the nature of the SMB proceeding as a shield, Marfork argues essentially that since it is a new proceeding for purposes of review it would be improper to permit DEP to rely on the record appealed from to establish its *prima facie* case. While we do not disagree that it would be preferable for the DEP to begin an appeal from a show cause hearing with a separate introduction of the evidence upon which it relies to assert the alleged pattern of statutory viola-

---

**23.** Also included with each of the violations was the negligence rating for each citation, which bears on the issue of the amount of the civil penalty which can be levied. *See* W.Va. R. *Environmental Protection* 38 § 2–20.7 (specifying nu-

merical rating system of 1 to 10 with 10 being the most serious).

**24.** *See supra* note 15.

tions, there was no burden placed upon Marfork to prove the existence of these violations.

The violations were part of the record and the purpose of the appeal before the SMB was to provide Marfork with a second bite at the appellate apple—to offer it yet another opportunity to demonstrate why it should not have its permit suspended or revoked. At the SMB proceeding, Marfork had both the burden of production to respond to the charges (of which it was fully informed) of its pattern of violations under West Virginia Code § 22–3–17(b) and the ultimate burden of persuasion on the issue of permit suspension. These evidentiary burdens were the same burdens it had at the show cause proceeding. In arguing that it was wrongly required to assume a burden imposed by law upon the DEP, Marfork is just plain wrong. Moreover, we can find no evidence from the record before us which suggests that Marfork's opportunity of appeal before the SMB was prejudicially affected by virtue of DEP's failure to reintroduce, as a matter of procedural formality, its Exhibit 1—the "show cause package." Consequently, we find no reversible error to have resulted by virtue of DEP's reliance on its evidence introduced before the hearing examiner at the show cause hearing to establish the requisite *prima facie* evidence of a pattern of violations sufficient to come within the meaning of West Virginia Code § 22–3–17(b).

Based on the foregoing, the order of the Circuit Court of Raleigh County is hereby reversed and this matter is remanded to the lower court for proceedings consistent with this opinion and to require the consideration of those substantive issues of appeal raised by Marfork in its appeal from the DEP order entered on January 14, 2002.

Reversed and remanded.

Chief Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

Justices STARCHER and McGRAW concur and reserve the right to file concurring opinions.

1. A.T. Massey is the parent corporation of Marfork, and is based in Richmond, Virginia. A.T.

McGRAW, Justice, concurring:

(Filed June 30, 2004)

I concur with the majority decision, but write separately to decry the fact that our Legislature has provided permit suspension or revocation as the only meaningful punishment in a case such as this. Suspension or revocation of a mining permit means that the mine owners will be punished a little while the coal miners will be harmed a lot. Unlike a substantial monetary fine, any action that stops the mining puts a greater burden on a Boone County coal miner than it does a stockholder in Richmond or Amsterdam.[1]

Not surprisingly, employees of the Division of Natural Resources face great public pressure to keep the mines open and the miners at work. Until the Division of Natural Resources has a greater ability to fine companies that break the law without directly harming the miner who is just doing his job, we will continue to have under-enforcement of the mining laws in West Virginia.

MAYNARD, Chief Justice, dissenting:

(Filed July 6, 2004)

I dissent in this case because I do not believe that Marfork Coal Company ("Marfork") received a fair hearing. Rather, it is clear to me that Marfork faced nothing less than a kangaroo court with Director Crum presiding. To merely say that Director Crum was a biased hearing examiner is being overly generous. His decision to suspend Marfork's surface mining permit was a foregone conclusion before Marfork ever stepped into the hearing room. Director Crum's lack of impartiality and his prejudgment of this case is evident from his remarks in a press release issued prior to the hearing.

In that regard, two months before Marfork's hearing, Director Crum announced to the press that "major enforcement actions" were being taken against three coal subsidiaries of Massey Energy Corporation. He specifically identified Marfork as one of those subsidiaries. Director Crum's press release also stated that Marfork's "patterns of water

Massey has at times been affiliated with Royal Dutch Shell of the Netherlands.

pollution discharges" were "unpermitted releases into Brushy Fork in Boone County from its impoundment." The press release further indicated that "[t]he show cause proceedings are in addition to assessments of penalties against the companies through notices of violations" and directly quoted Director Crum as saying that "[t]his method of enforcement has a much greater potential for getting an operator's attention and compelling compliance." The press release concluded with Director Crum declaring that, "These three companies have failed to operate and maintain their facilities in accordance with state law and we are taking the actions necessary to prevent future violations." I emphasize that these are the remarks of the "judge" who will try the case made weeks before the hearing. Astonishing!

Based on Director Crum's press release, it is obvious that Marfork had absolutely no chance of receiving a fair and impartial hearing. Not only had Director Crum already made up his mind, he announced as much in the press release. In effect, Crum was both the prosecutor and the judge in this Star Chamber proceeding.

Generally, "[i]t is the duty of the presiding judge under both the statutory and decisional law to excuse himself when he has an interest in the outcome of the case before him or when he has any doubt as to his ability to preside impartially or whenever his impartiality can be reasonably questioned." 46 Am.Jur.2d *Judges* § 95 (1994) (Footnotes omitted). Moreover,

> [w]here the circumstances are such as to create in the mind of a reasonable man a suspicion of bias, there may well be a basis for disqualification though in fact no bias exists. For this reason, a judge should disqualify himself where grounds for disqualification exist, as well as in situations where his impartiality might reasonably be questioned. A judge should disqualify himself when circumstances and conditions surrounding the litigation are of such nature that they might cast doubt and question as to the impartiality of any judgment.

46 Am.Jur.2d *Judges* § 86 (1994). Clearly, to any fair observer, Director Crum's impartiality was very questionable in this case.

The basic requirement that a judge or hearing examiner be fair and impartial is so fundamental to our system of justice and our concept of due process that to allow this individual to act as a presiding judicial officer in this case, in spite of his so flagrantly and openly expressed bias against a party over whom he is empowered to sit in judgement, is both repugnant and offensive. The actions of Director Crum in this case are similar to a circuit judge making comments regarding an accused murderer two weeks before he sits as the accused's trial judge. If the trial judge made comments to the press indicating that he believed the accused was a bad person or that he committed the murder, without question this Court would find that judge to be disqualified. While factually this case may be different, the premise is the same and Marfork was equally entitled to an impartial tribunal.

In my opinion, this case actually belongs in the annals of bad cases with unfair judges and bad results. It goes somewhere on the list of really bad trials, a few of which follow as examples. The trial of Susan B. Anthony for being a woman and voting, where Judge Ward Hunt barred her from testifying and directed a jury to find her guilty, which of course they did. Or the trial of Galileo for heresy for correctly teaching that the sun, not the earth, was the center of the solar system and the earth and other planets merely revolved around it. Seven of his ten judges found this incredible, and they promptly convicted him. And Cardinal Bellarmine ordered Galileo not to ever say that again, and so he recanted.

This list could go on forever but I will close it with only one more example, the famous "monkey" trial of John Scopes who was convicted of teaching evolution down in Tennessee. When Judge John Raulston was clearly being one-sided in favor of the prosecutor during trial one day, Clarence Darrow began saying very provocative things in court about bias and unfairness, which rattled the learned jurist Judge Raultston. "I hope," said the Judge nervously, "that counsel intends no reflection upon this Court!" Whereupon Darrow replied: "Your honor," he said, "is always entitled to hope!"

One is left to wonder how Clarence Darrow would have dealt with the hearing examiner in this case.

Unlike the majority, I think there is considerable evidence showing that Marfork was denied procedural due process, and therefore, I cannot agree with its decision in this case. Furthermore, I am also troubled by the fact that the "punishment" for the types of violations like those alleged against Marfork is suspension of the company's operating permit. When a permit is suspended, as in this case, the only people "punished" are the innocent coal miners who are suddenly out of work. No West Virginian wants our waterways polluted, and people who allow this to occur should be punished, and severely, but surely very large fines or other harsh sanctions are better alternatives. Our State is losing more and more good paying jobs every day, jobs such as coal mining jobs, which provide a decent income sufficient to raise a family. West Virginia needs these jobs, and I don't believe that putting innocent coal miners out of work is the best answer in these types of cases.

Accordingly, for all the reasons set forth above, I respectfully dissent.

STARCHER, Justice, concurring:
(Filed July 14, 2004)

The dissent compares the actions of the DEP hearing examiner to a "circuit judge indicating publicly that he [sic] believed the accused was a bad person or that he committed the murder," two weeks before the individual's trial. Of course, such a judge would be disqualified.

But the author of the dissent and I are both uniquely situated[1] to know that such comments are commonly made by circuit judges *after* a criminal defendant's conviction—typically during sentencing. As the Court's opinion demonstrates, the *fact* of Marfork's multiple offenses and wrongdoing was established conclusively well before Director Crum's comments on the show cause hearing process, which is essentially a penalty process. Ironically, the analogy and example offered by the dissent as the analytical

heart of its argument against the majority opinion—turns out to fully support the majority's conclusion.

It is also worth noting that the dissent does not point to *one line* of the transcript of the hearing as evidence of any unfairness.

Like the dissent, I also hate it that a worker has to lose even a day's pay because management has been ignoring environmental and human health and safety laws. (But short-term unemployment benefits are available.) Restaurants have to shut down as a penalty when health inspectors find repeated health and safety violations. MSHA shuts down unsafe mines. The Legislature and Congress set permit suspension as the remedy—we must presume, for good reasons. I have never heard of a coal company offering to pay "huge fines" to avoid their workers losing a day's pay. When we get that case I will have an open mind to the dissent's arguments.

Accordingly, I concur.

---

1. On this Court, only the dissent's author and I have served as trial judges.